**GOMEZ TRIAL ATTORNEYS**
JOHN H. GOMEZ (171485)
*jgomez@thegomezfirm.com*
DEBORAH S. DIXON (248965)
*ddixon@thegomezfirm.com*
655 W. Broadway Suite 1700
San Diego, California 92101
Telephone: (619) 237-3490
Facsimile: (619) 237-3496

**THE HABA LAW FIRM, P.A.**
LISA D. HABA (*pro hac vice*)
*lisahaba@habalaw.com*
1220 Commerce Park Dr., Ste. 207
Longwood, Florida 32779
Telephone:  (844) 422-2529

**DICELLO LEVITT GUTZLER LLC**
GREG G. GUTZLER (*pro hac vice*)
*ggutzler@dicellolevitt.com*
One Grand Central Place
60 E. 42nd Street, Suite 2400
New York, New York 10165
Telephone:  (646) 933-1000

***Counsel for Plaintiffs***
*Additional Counsel Listed on Signature Page*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| JANE DOE NOS. 1-10,<br><br>Plaintiffs,<br><br>v.<br><br>DANIEL S. FITZGERALD,<br><br>Defendant. | Case No: 2:20-cv-10713-DDP-RAO<br><br>**SECOND AMENDED COMPLAINT** |

## INTRODUCTION

1.     On December 15, 2020, the Department of Justice ("DOJ") indicted Peter Nygard for spearheading a decades-long racketeering enterprise and sex trafficking venture, which was enabled by myriad accomplices and co-conspirators, including Defendant Daniel Fitzgerald ("Defendant" or "Fitzgerald") ("Nygard-Fitzgerald Sex Trafficking Racketeering Enterprise"). *See United States v. Nygard*, No. 20 CR 624 (S.D.N.Y.) ("DOJ Indictment") (annexed as Exhibit 1).

2.     The purpose of the Nygard-Fitzgerald Sex Trafficking Racketeering Enterprise is to "recruit, entice, transport, harbor, and maintain adult and minor-aged female victims for Nygard's sexual gratification," including through the use of "force, fraud, and coercion to cause women to engage in commercial sex with Nygard **and others**." *See* Ex. 1 at ¶ 3 (emphasis added).

3.     Nygard and his associates "used fraud, force and coercion to cause at least dozens of adult and minor-aged female victims to engage in commercial sex by recruiting, enticing, transporting, harboring, and maintaining adult and minor-aged female victims for Nygard's sexual gratification and, on occasion, the gratification of ***Nygard's personal friends*** and business associates." Ex. 1, ¶ 11 (emphasis added).

4.     Defendant Fitzgerald is one of Nygard's oldest and closest personal friends; and Fitzgerald is a key member of the Nygard Sex Trafficking Racketeering Enterprise.

5.     As stated in the DOJ Indictment, as a part of the Nygard-Fitzgerald Sex Trafficking Racketeering Enterprise, **Nygard would engage in "sexual 'swaps' with male friends** and business associates, who would bring Nygard a 'date' for sex in exchange for access to one of Nygard's s 'girlfriends' for sex. 'Girlfriends' were not consulted in advance that they would be traded for sex and Nygard often pressured them to comply with such swaps at his direction through manipulation, intimidation, degradation, and threats." Ex. 1, ¶18(b) (emphasis added).

6.     Fitzgerald also had his own sex trafficking venture, modeled after the Nygard venture, in which Fitzgerald was the kingpin.  Fitzgerald had experience with sex trafficking, learning from and modeling his activities after Nygard ("Fitzgerald Sex Trafficking Racketeering Enterprise").

7.     Some plaintiffs in this case were victims of the Nygard-Fitzgerald Sex Trafficking Racketeering Enterprise; they were "swapped" from Nygard to Fitzgerald and forced to engage in sex acts with Fitzgerald.  As a member of the Nygard-Fitzgerald Sex Trafficking Racketeering Enterprise, Fitzgerald knowingly participated in, and benefited from, the venture by engaging in commercial sex acts with young women who he knew were being sex trafficked by Nygard and the web of companies he owns and controls ("Nygard Companies").

8.     Other plaintiffs in this case were victims of Fitzgerald's own sex trafficking venture.

9.     This is a civil action for damages under the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595 ("TVPRA"), and state law, brought by Plaintiffs Jane Doe Nos. 1-10, arising from Defendant Fitzgerald's participation in the Nygard-Fitzgerald Sex Trafficking Racketeering Enterprise, as well as the Fitzgerald Sex Trafficking Racketeering Enterprise and his subsequent harassment and defamation of multiple Plaintiffs.

## PARTIES

**A.     Plaintiff Jane Doe Nos. 1-10**

9.     Jane Doe No. 1 is a United States citizen that resides in the United States.

10.     Jane Doe No. 2 is a United States resident that resides in the United States.

11.     Jane Doe No. 3 is a United States citizen that resides in the United States.

12.     Jane Doe No. 4 is a United States citizen that resides in the United States.

13.     Jane Doe No. 5 is a United States resident that resides in the United States.

14.     Jane Doe No. 6 is a United States resident that resides in the United States.

15.     Jane Doe No. 7 is a United States resident that resides in the United States.

16.     Jane Doe No. 8 is a United States resident that resides in the United States.

17.     Jane Doe No. 9 is a United States citizen that resides in the United States.

18.     Jane Doe No. 10 is a United States citizen that resides in the United States.

19.     Plaintiffs are using pseudonyms because of the highly personal nature of their victimization and because of the serious risk of harm to which they would be exposed if they brought this suit in their actual names.

20.     Plaintiffs are at serious risk of retaliatory harm from filing this lawsuit because Fitzgerald has committed acts of violence against one or more of the Plaintiffs when they have acted against his wishes.

21.     Further, Fitzgerald participated in creating a video, posted on YouTube, that identifies various Jane Does that Fitzgerald suspects are suing him, uses private videos and images, and wrongfully accuses them of being felons.

22.     Fitzgerald is also stalking the mother of one of the alleged Jane Does and slandering the Jane Doe to Jane Doe's mother.

23.     Fitzgerald's intimidation tactics also involve violence.  For example, Fitzgerald's violent temper surfaced when Jane Doe No. 4 attempted to leave a Fitzgerald property, and Fitzgerald attacked her and attempted to suffocate her.

24.     Fitzgerald's propensity for violence further showed when he dislocated Jane Doe No. 5's shoulder, tore her labrum, and caused severe physical injury to her back and breasts while attacking her.

25.     Further, Defendant has already articulated – and in fact manifested – his intent to publicly humiliate and shame Plaintiffs by claiming that Plaintiffs are simply seeking a "payday," attempting to besmirch the truth of their trauma and further marginalize and denigrate them for shining the light of truth on Defendant's conduct. Fitzgerald has distributed and continues to distribute the video that identifies Plaintiffs, and he further participates in malicious, false, and defamatory social media posts in order to intimidate and humiliate various Jane Does and other witnesses.

26.     Defendant Fitzgerald continues to actively contact other victims of his and Nygard's sex trafficking ventures to influence, intimidate, coerce, and defraud them into remaining silent and to keep them from coming forward with their truth.

27.     Additionally, Defendant and his co-conspirators, such as Nygard and the Nygard Companies, have tremendous wealth and power and have used it to retaliate against others who have attempted to come forward.

28.     Plaintiffs are also vulnerable because of Defendant's co-conspirators' corruption of law enforcement through bribery and political influence.[1]

29.     Because Fitzgerald's victimization of Plaintiffs is part of sex trafficking conspiracy and, therefore, was inextricably intertwined with, and directly involved with Peter Nygard, Plaintiffs reasonably fear retaliation from both Defendant Fitzgerald and from Nygard and their myriad co-conspirators, who actively tamper with witnesses and engage in intimidation tactics and threats.

---

[1] *See, e.g.*, https://www.youtube.com/watch?v=Pw1xUXQNelg; http://www.tribune242.com/news/2018/feb/14/nygard-outright-bribery-plp/; http://www.tribune242.com/news/2014/jun/25/nygard-gave-money-plp-then-asked-help-over-land-is/;http://www.tribune242.com/news/2017/may/05/fresh-questions-over-las-vegas-trip-pm-gibson-and-/.

1    30.    Plaintiffs' safety, right to privacy, and personal security outweigh the

2    public interest in their identification.

3    31.    Plaintiffs' legitimate concerns for privacy outweigh any prejudice to

4    Defendant by allowing Jane Does Nos. 1-10 to proceed anonymously.

5    **B.    Defendant**

6    32.    Defendant Daniel S. Fitzgerald is a California citizen who resides in

7    California and owns properties in California, as well as a real estate development

8    company that conducts substantial business in California.[2]

9    33.    Fitzgerald conspired with and engaged in an enterprise with numerous

10   third parties located both in and outside the State of California, including, but not

11   limited to, Nygard, the Nygard Companies, myriad Nygard Companies' employees,

12   and other unidentified co-conspirators and enterprise associates.

13                      **JURISDICTION AND VENUE**

14   34.    This Court has federal question subject-matter jurisdiction pursuant to

15   28 U.S.C. § 1331, because Plaintiffs bring this action under the federal TVPRA

16   statute, 18 U.S.C. § 1595.

17   35.    Plaintiffs Jane Doe Nos. 1-10's claims arise out of the same series of

18   transactions or occurrences and share common questions of law or fact.   The

19   essential facts underlying Jane Doe Nos. 1-10's claims are so logically connected

20   that considerations of judicial economy and fairness dictate that all the issues be

21   resolved in a single lawsuit.   There is also substantial overlap in questions of law or

22   fact across Jane Doe Nos. 1-10's claims.

23   36.    This Court also has supplemental jurisdiction over Plaintiffs' State law

24   claims pursuant to 28 U.S.C. § 1367(a), because all claims alleged herein are part of

25   the same nucleus of operative facts.

26   37.    This Court has personal jurisdiction over Defendant because he is a

27   resident of this State.   Further, the events giving rise to the causes of action asserted

28

---

[2] https://www.dannyfitzgerald.com/aboutcontec.

*Jane Doe Nos. 1-10 v. Daniel S. Fitzgerald*, Case No. 2:20-cv-10713-DDP-RAO
SECOND AMENDED COMPLAINT

herein substantially occurred in California, insofar as Fitzgerald knowingly conspired, aided and abetted, facilitated, and directly participated in the Nygard-Fitzgerald Sex Trafficking Racketeering Enterprise through actions that occurred in this State.  Fitzgerald also knowingly conspired, aided and abetted, facilitated and directly participated in his own sex trafficking venture including actions that occurred in the state of California.

38.    Venue is proper in this District, under 28 U.S.C. § 1391(b)(2), because Defendant Fitzgerald knowingly engaged in sex trafficking in this District and, therefore, a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

## LEGAL BACKGROUND

### I.  THE TVPRA

39.    The federal sex trafficking statute, 18 U.S.C. § 1591, outlaws sex trafficking activities that affect interstate or foreign commerce or take place within the territorial jurisdiction of the United States.  It is to be construed expansively because it serves a remedial purpose and uses intentionally broad language.

40.    The federal sex trafficking statute, 18 U.S.C. § 1591, makes it a federal felony if any person acting in interstate or foreign commerce, or within the territorial or maritime jurisdiction of the United States, knowingly:

> (1) … recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or
>
> (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),
>
> knowing, or … in reckless disregard of the fact, that means of force, threats of force, fraud, coercion …, or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act ….

41.    The TVPRA, 18 U.S.C. § 1595, provides a civil remedy to victims of sex trafficking crimes, including violations of 18 U.S.C. § 1591, against the

perpetrator of such crimes and against anyone else who knowingly benefits, financially or by receiving anything of value, from participation in a venture which that person knew or should have known has engaged in a sex trafficking crime. 18 U.S.C. §1595(a).

## FACTUAL ALLEGATIONS

**I.    Fitzgerald Engaged in Commercial Sex Acts with Jane Doe Nos. 1-10, Knowing They Were Being Trafficked by Fitzgerald and/or Nygard.**

42.    Fitzgerald knowingly participated in the Nygard-Fitzgerald Sex Trafficking Racketeering Enterprise by engaging in commercial sex acts with Jane Doe Nos. 1-10, who are sex trafficking victims of both Nygard and Fitzgerald.

43.    Fitzgerald regularly participated in Nygard's sex trafficking venture and enterprise, and also conspired with Nygard, to build his own sex trafficking network and scheme.

44.    Fitzgerald is a long-time friend and associate of Nygard's who frequently attended "pamper parties"[3] and dinners (events used by Nygard to lure and traffic his victims) at Nygard's Marina Del Rey property and other locations around the world.

45.    "To recruit victims, Peter Nygard, the defendant, and others known and unknown, used a ***network of trusted associates***, 'girlfriends,' and Nygard Group employees.  Many of the victims were initially invited to dinners or parties at Nygard's residences, particularly in the Bahamas and in Marina del Rey, California.…  Many victims were initially induced, coerced, and forced to have sex with Nygard through one or more of the following: false promises of modeling or fashion industry jobs; the supply of alcohol and/or drugs, including the drugging of drinks without the victim's knowledge; and physical force."  Ex. 1, ¶ 13 (emphasis

---

[3] https://www.instagram.com/p/BehBmpwDZW-/;
https://www.instagram.com/p/BjmAvU2A86k/; https://www.instagram.com/p/BrMcKpBn28C/;
https://www.instagram.com/p/B3TwcWWAP2K/; https://www.instagram.com/p/B4I2E_OgQai/

added).  The referenced "network of trusted associates" includes Fitzgerald, with whom Nygard frequently "swapped" or attempted to "swap" sex trafficking victims, including several of the Jane Does herein.

46.     Fitzgerald was one of Nygard's closest friends and, according to Nygard, he and Fitzgerald "shared literally everything."

47.     Fitzgerald was Nygard's companion at the pamper parties and dinners where Nygard exercised complete control over young women whose passports had been confiscated and had no money or lodging.

48.     At those parties and dinners, Nygard would instruct his young girlfriends to engage in sex acts with Fitzgerald.

49.     Fitzgerald knew that without Nygard's instruction, the "girlfriends" were controlled and forbidden from doing any such thing.

50.     Fitzgerald knew that Nygard's "girlfriends" were being forced to engage in sex acts with Fitzgerald because he acknowledged Nygard's instruction for them to do so by saying to Nygard after the sex acts, for example, "Thanks, Peter!"

51.     While participating in, and learning from, Nygard's sex trafficking venture, Fitzgerald started employing Nygard's tactics to develop his own sex trafficking venture; to wit, Fitzgerald would promise young women lodging and career opportunities if they lived with him or stood by his side.  But what the women weren't told is that they would be coerced into sex acts with Fitzgerald and others close to him.

52.     Based on his decades of friendship with Nygard and his attendance at events with Nygard, Fitzgerald knows of the Nygard Sex Trafficking Racketeering Enterprise and was one of Nygard's most trusted associates.

53.     When Nygard was in Marina del Rey, as noted above and described more fully below, Fitzgerald would routinely be at Nygard's house, engaging in

1  numerous predicate acts in furtherance of the Nygard Sex Trafficking Racketeering

2  Enterprise.





(Nygard is on the left; Fitzgerald's hand is entering from the right)

*Jane Doe Nos. 1-10 v. Daniel S. Fitzgerald*, Case No. 2:20-cv-10713-DDP-RAO
SECOND AMENDED COMPLAINT



54.     Fitzgerald openly promotes the Nygard image in order to recruit, lure, and entice young women to attend the "pamper parties" and events at Nygard's properties.

55.     Fitzgerald is even listed on Nygard Companies' employee contact lists as an employee at the Marina del Rey compound.

56.     Fitzgerald has traveled on the Nygard Companies' corporate jet ("N-Force") to locations in South America, the Caribbean, and New York for the purpose of furthering and participating in the sex trafficking venture and enterprise.

57.     Fitzgerald also knowingly recruits, lures, and entices young women to engage in commercial sex acts with himself and Nygard, flying them from, among other places, locations in Las Vegas, Nevada and San Jose, California.[4]

58.     Nygard frequently traveled to California and stayed at his Marina del Rey property. On most such occasions, Fitzgerald would come to the Marina del Rey house for dinner, poker, and forced commercial sex acts with one of Nygard's "girlfriends" or other women.

59.     As corroborated by the DOJ Indictment, personal friends and associates of Nygard would "swap" women with Nygard; Fitzgerald was the most notable of

---

[4] *See* https://www.instagram.com/p/B4I2E_OgQai/

those friends who, in exchange for sex acts, would bring a female with him to "offer" to Nygard.

60.     In exchange for Fitzgerald's knowing recruitment for, participation in, and conspiracy in Nygard's continuing sex trafficking venture and enterprise, Nygard forced his "girlfriends" and/or sex workers to perform commercial sex acts with Fitzgerald.

61.     Fitzgerald also uses his association with Nygard and the Nygard enterprise, and his attendance at "pamper parties," to benefit and promote himself and his business on social media, and to further the goals of the Nygard enterprise.[5]

62.     Fitzgerald portrays himself as a playboy, entrepreneur, and partier who rents luxurious homes in Hollywood to celebrities and "influencers" for them to throw parties.[6] In doing so, he also promotes the purpose of the Nygard enterprise, which is to lure and recruit additional sex trafficking victims to engage in commercial sex acts with himself, Nygard, and other associates.

63.     Fitzgerald also viewed himself in the same manner that Nygard did and attempted to gather a group of women around himself that he could have at his "beck and call" for sexual service.  Fitzgerald copied the Nygard model, called the women his "girlfriends," had the girlfriends live at his residence, provided these women something of value (housing, payment, etc.) in exchange for sexual acts, and brought them to Nygard's house for a "swap" or an attempted "swap" of the women with Nygard.

A.     **Jane Doe No. 1**

64.     Jane Doe No. 1 was trafficked when Fitzgerald engaged as an active participant in Nygard's sex trafficking venture and participated in a "sex swap" with Jane Doe No. 1 and another female.

---

[5] *See* https://www.instagram.com/p/BehBmpwDZW-/;
https://www.instagram.com/p/BjmAvU2A86k/;  https://www.instagram.com/p/BrMcKpBn28C/;
https://www.instagram.com/p/B3TwcWWAP2K/; https://www.instagram.com/p/B4I2E_OgQai/
[6] *See* https://www.dannyfitzgerald.com/; https://www.dannyfitzgerald.com/media

65.     Jane Doe No. 1 was an employee of the Nygard Companies, and sex trafficking victim of Nygard and the Nygard Companies.

66.     Nygard exploited his financial, physical, and psychological control over Jane Doe No. 1, which Fitzgerald knew about, to force her to engage in sex acts with Fitzgerald as part of a "swap."

67.     As such, Fitzgerald participated in and benefited from the Nygard-Fitzgerald Sex Trafficking Racketeering Enterprise.

68.     At a party at Nygard's Marina del Rey property, she met Fitzgerald and his female companion.

69.     Nygard directed Jane Doe No. 1 to engage in sex acts with Fitzgerald against her will.

70.     Fitzgerald then sexually assaulted Jane Doe No. 1, at Nygard's direction.

71.     Fitzgerald then escorted Jane Doe No. 1 to a bedroom and engaged in more sex acts, at Nygard's direction and against her will.

72.     At the same time Nygard had sexual intercourse with the other female provided to him in a "swap" by Fitzgerald.

73.     Fitzgerald and Nygard each received sexual gratification in exchange for these sexual acts.

74.     Jane Doe No. 1 received something of value in exchange for the sex acts. Namely, she was able to avoid being punished financially and otherwise, including keeping her employment and lodging, and avoided Nygard's wrath by doing what was instructed.

75.     Consequently, Jane Doe No. 1 has been physically, psychologically, financially, and/or reputationally harmed by Fitzgerald.

**B.     <u>Jane Doe No. 2</u>**

76.     Jane Doe No. 2 was trafficked when Fitzgerald engaged as an active participant in Nygard's sex trafficking venture and participated in a "sex swap" with

Jane Doe No. 2 and another female.

77.     Jane Doe No. 2 was an employee of the Nygard Companies, and sex trafficking victim of Nygard and the Nygard Companies.

78.     Nygard exploited his financial, physical, and psychological control over Jane Doe No. 2, which Fitzgerald knew about, to force her to engage in sex acts with Fitzgerald.

79.     As such, Fitzgerald participated in and benefited from the Nygard-Fitzgerald Sex Trafficking Racketeering Enterprise.

80.     Jane Doe No. 2 was lured into a bedroom at Nygard's Marina del Rey Property, where she met Fitzgerald and his female companion.

81.     Nygard partially undressed Jane Doe No. 2 and directed Jane Doe No. 2 to engage in sex acts with Fitzgerald against her will.

82.     Fitzgerald engaged in sex acts with Jane Doe No. 2 at Nygard's direction and against her will while Nygard engaged in sexual acts with the other female provided to him by Fitzgerald.

83.     Fitzgerald and Nygard each received sexual gratification in exchange for these sexual acts.

84.     Jane Doe No. 2 received something of value in exchange for the sex acts.   Namely, she was compensated financially, maintained employment, and avoided Nygard's wrath by complying with his demands.

85.     Consequently, Jane Doe No. 2 has been physically, psychologically, financially, and/or reputationally harmed by Fitzgerald.

**C.    Jane Doe No. 3**

86.     Jane Doe No. 3 was trafficked when Fitzgerald engaged as an active participant in Nygard's sex trafficking venture and participated in a "sex swap" with Jane Doe No. 3 and another female.

87.     Jane Doe No. 3 was an employee of the Nygard Companies, and sex trafficking victim of Nygard and the Nygard Companies.

88.    Nygard exploited his financial, physical, and psychological control over Jane Doe No. 3, which Fitzgerald knew about, to force her to engage in sex acts with Fitzgerald.

89.    As such, Fitzgerald participated in and benefited from the Nygard-Fitzgerald Sex Trafficking Racketeering Enterprise.

90.    At a dinner party at Nygard's Marina del Rey Property, she met Fitzgerald and his female companion.

91.    Nygard directed Jane Doe No. 3 to engage in sex acts with Fitzgerald against her will.

92.    Fitzgerald engaged in sex acts with Jane Doe No. 3 at Nygard's direction and against her will while Nygard engaged in sexual acts with the other female provided to him by Fitzgerald.

93.    This occurred on more than one occasion.

94.    Fitzgerald and Nygard each received sexual gratification in exchange for these sexual acts.

95.    Jane Doe No. 3 received something of value in exchange for the sex acts.    Namely, she was compensated financially, maintained employment, and avoided Nygard's wrath by complying with his demands.

96.    Consequently, Jane Doe No. 3 has been physically, psychologically, financially, and/or reputationally harmed by Fitzgerald.

**D.    <u>Jane Doe No. 4</u>**

97.    Jane Doe No. 4 was trafficked when Fitzgerald engaged as an active participant in Nygard's sex trafficking venture and participated in a "sex swap" with Jane Doe No. 4 and another female.  She also was forced and coerced to engage in commercial sexual acts with Fitzgerald while living under his roof.

98.    Jane Doe No. 4 met Nygard, and he invited her to live at his Marina del Rey property.

/ / /

99.   While living at Nygard's property, Jane Doe No. 4 was repeatedly required to indulge Nygard's sexual appetites against her will.

100.   On multiple occasions while Jane Doe No. 4 was living there, Fitzgerald came to Nygard's house with a female companion.

101.   Nygard exploited his financial, physical, and psychological control over Jane Doe No. 4, which Fitzgerald knew about, to force her to engage in sex acts with Fitzgerald.

102.   As such, Fitzgerald participated in and benefited from the Nygard-Fitzgerald Sex Trafficking Racketeering Enterprise.

103.   Fitzgerald engaged in sex acts with Jane Doe No. 4 at Nygard's direction and against her will while Nygard engaged in sexual acts with the other female provided to him by Fitzgerald.

104.   This occurred on more than one occasion.

105.   Fitzgerald and Nygard each received sexual gratification in exchange for these sexual acts.

106.   Jane Doe No. 4 received something of value in exchange for the sex acts.   Namely, she was compensated financially, maintained employment, and avoided Nygard's wrath by complying with his demands.

107.   After a few months, Nygard notified Jane Doe No. 4 that she would no longer be allowed to stay at his house; Nygard suggested she contact Fitzgerald for a place to live.

108.   Having no options and no money, Jane Doe No. 4 moved into Fitzgerald's house.   No expectations were communicated at this time.

109.   Shortly thereafter, Fitzgerald informed Jane Doe No. 4 that she was expected to engage in "threesomes" with Fitzgerald and his girlfriend.

110.   Jane Doe No. 4 repeatedly attempted to avoid sexual contact with Fitzgerald.

/ / /

111.   On one or more occasions, Jane Doe No. 4 was sleeping and woke up to find Fitzgerald on top of her, raping her.  Jane Doe No. 4 did not consent to this sexual act and on each occasion had her door locked prior to falling asleep.

112.   Fitzgerald received sexual gratification in exchange for these sexual acts with Jane Doe No. 4.

113.   Jane Doe No. 4 received a place to stay in exchange for the sex acts with Fitzgerald.

114.   After enduring this treatment several times, Jane Doe No. 4 decided to leave and told Fitzgerald of her intent to do so.

115.   In response, Fitzgerald became enraged, calling Jane Doe No. 4 profane and racist epithets before violently holding her down and attempting to suffocate her with his other hand.  Jane Doe No. 4 was not able to breathe or get up during Fitzgerald's attack.

116.   Jane Doe No. 4 was in fear of Fitzgerald and what would happen if she left the property.

117.   When Jane Doe No. 4 finally did escape, she did so in the dead of night, so as to avoid detection by, and physical harm from, Fitzgerald.

118.   On July 9, 2021, Fitzgerald, or someone acting at the direction of and/or in coordination with Fitzgerald, posted a video to YouTube for public viewing, which identifies Jane Doe No. 4 by name and photograph and falsely accuses her of lying, sexual misconduct, and committing serious criminal activity, among other falsehoods.[7]  As of August 10, this video has been viewed over 1,560 times and has over twenty comments.

119.   Consequently, Jane Doe No. 4 has been physically, psychologically, financially, and/or reputationally harmed by Fitzgerald.

/ / /

---

[7] Plaintiffs omit the URL of this YouTube video from this Complaint so as to not perpetuate the defamatory statements and exacerbate the harm it has caused them.

**E.**   **Jane Doe No. 5**

120.   Jane Doe No. 5 was trafficked when Fitzgerald groomed, recruited, and lured her to travel from the United States to Mexico wherein she also was forced and coerced to engage in commercial sexual acts with Fitzgerald.

121.   Jane Doe No. 5 ran into Fitzgerald on a trip where Fitzgerald encouraged her to stay at his residence under the ruse of offering her a job working an event that offered a financial payment, networking opportunities with important people, free "swag," and recreational opportunities.  Fitzgerald did not request or require rent be paid.

122.   The place where Fitzgerald was staying was remotely located so that it was too far for Jane Doe No. 5 to try to leave.

123.   Once Jane Doe No. 5 was in the home, Fitzgerald began to groom her. He engaged in open sexual acts in front of her with other women and made multiple lewd comments and sexual propositions to her.

124.   After being turned down numerous times, Fitzgerald demanded that Jane Doe No. 5 pay for gas and lift tickets for everyone because "all [his] girls pay in some way or another."  Jane Doe No. 5 understood this to mean that she had to pay financially since she didn't pay for her stay at the house with sexual acts.

125.   Fitzgerald brought Jane Doe No. 5 to the house of Fitzgerald's friend, Peter Nygard.

126.   While playing poker, Fitzgerald told the men, including Peter Nygard, that "whoever wins can have [Jane Doe No. 5] for the night."

127.   Fitzgerald invited Jane Doe No. 5 to Cabo San Lucas, Mexico with the intent to engage in commercial sex acts with her.

128.   Fitzgerald invited, recruited, and transported Jane Doe No. 5 from California to Cabo San Lucas for this purpose.

129.   Jane Doe No. 5 stayed in her own room at a resort.

/ / /

130.   While at the resort, Fitzgerald made frequent comments about his sexual desires and showed Jane Doe No. 5 self-made pornography while they were in a public jacuzzi at the resort.

131.   When Jane Doe was in Fitzgerald' suite, he went to the bathroom, took off all his clothes, and stated that he needed to shower.

132.   Fitzgerald then violently grabbed Jane Doe No. 5, and sexually assaulted her.

133.   Jane Doe No. 5 was afraid and was screaming, crying, and fighting back during Fitzgerald's attack.

134.   During the attack, Fitzgerald used his substantial strength and dislocated Jane Doe No. 5's shoulder, tore her labrum, and caused severe physical injury to her back and breast tissue.

135.   Fitzgerald received sexual gratification in exchange for these sexual acts with Jane Doe No. 5.

136.   On July 9, 2021, Fitzgerald, or someone acting at the direction of and/or in coordination with Fitzgerald, posted a video to YouTube for public viewing, which identifies Jane Doe No. 5 by name and photograph and falsely accuses her of lying, sexual misconduct, and committing serious criminal activity, among other falsehoods.  As of August 10, this video has been viewed over 1,560 times and has over twenty comments.

137.   On or about July 31, 2021, Fitzgerald began physically and verbally harassing Jane Doe No. 5 in the town in which she lives.  Subsequently, he created and printed paper flyers portraying Jane Doe No. 5's photograph and name along with false and harmful statements about her, accusing her of criminal activity, and Fitzgerald has distributed or caused to be distributed these defamatory flyers around the community in which Jane Doe No. 5 currently resides.

138.   Consequently, Jane Doe No. 5 has been physically, psychologically, financially, and/or reputationally harmed by Fitzgerald.

## F.    <u>Jane Doe No. 6</u>

139.   Jane Doe No. 6 was trafficked when Fitzgerald forced and/or coerced her to engage in commercial sexual acts while living under his roof.

140.   Jane Doe No. 6 met an advocate for Karma International, a self-proclaimed philanthropic organization.

141.   Jane Doe No. 6 was then invited to a party at Victorino Noval's house in Beverly Hills.  At that party, she was introduced to Peter Nygard, Fitzgerald, and Steven Powers.

142.   Later, Jane Doe No. 6 rented a room in a property owned by Fitzgerald.

143.   The first day Jane Doe No. 6 moved in at Fitzgerald's property, Fitzgerald coerced her into having nude photos taken of her with another woman.

144.   On multiple occasions, Fitzgerald entered Jane Doe No. 6's room without her knowledge and engaged in sex acts with her against her will.

145.   Fitzgerald demanded that Jane Doe No. 6 not disclose the sex acts to his other "girlfriends," and cultivated an atmosphere of distrust and shame among all women living in the residence. This behavior ranged from sexual abuse to maintaining a domineering, patriarchal presence in the household (*e.g.*, referring to the significantly younger women as his "kittens").

146.   During her time at Fitzgerald's residence, Jane Doe No. 6 became concerned that some of Fitzgerald's "girlfriends" were undocumented women who relied upon Fitzgerald to secure their financial stability and to maintaining their residency in the United States.

147.   Jane Doe No. 6 witnessed Fitzgerald's efforts to evade service of the Complaint in this case when he ordered all members of the household to refuse packages, mail, or food deliveries.

148.   Fitzgerald also demanded that if anyone came to the residence seeking to speak to him, that they falsely claim that they did not know him, or that he did not live there.

149.   Jane Doe No. 6 felt intimidated and frightened into silence when Fitzgerald repeatedly asked her if she had spoken to the FBI.

150.   Jane Doe No. 6 felt further intimidated and frightened into silence when Fitzgerald and others, including one of Fitzgerald's "girlfriends," launched a coordinated attack against Jane Doe No. 6, falsely accusing her of theft and threatening her with arrest.

151.   Jane Doe No. 6 discovered legal documents that described Fitzgerald strangling and physically assaulting another woman.  This frightened Jane Doe No. 6 greatly.

152.   Shortly thereafter, Jane Doe No. 6 managed to escape.

153.   On July 9, 2021, Fitzgerald, or someone acting at the direction of and/or in coordination with Fitzgerald, posted a video to YouTube for public viewing, which identifies Jane Doe No. 6 by name and photograph and falsely accuses her of lying, sexual misconduct, and committing serious criminal activity, among other falsehoods.  As of August 10, this video has been viewed over 1,560 times and has over twenty comments.

154.   Consequently, Jane Doe No. 6 has been physically, psychologically, financially, and/or reputationally harmed by Fitzgerald.

**G.   <u>Jane Doe No. 7</u>**

155.   Jane Doe No. 7 was trafficked when Fitzgerald engaged as an active participant in Nygard's sex trafficking venture and participated in a "sex swap" with Jane Doe No. 7 and another female.

156.   Jane Doe No. 7 was a sex trafficking victim of Nygard and the Nygard Companies.

157.   Nygard exploited his financial, physical, and psychological control over Jane Doe No. 7, which Fitzgerald knew about, to force her to engage in sex acts with Fitzgerald.

158.   As such, Fitzgerald participated in and benefited from the Nygard-Fitzgerald Sex Trafficking Racketeering Enterprise.

159.   At a dinner party at Nygard's Marina del Rey Property, she met Fitzgerald and his female companion.

160.   Fitzgerald engaged in sex acts with Jane Doe No. 7 at Nygard's direction and against her will while Nygard engaged in sexual acts with the other female provided to him by Fitzgerald.

161.   After the sex acts were complete, Fitzgerald came downstairs and said, "Thanks, Peter."  In context, this comment was about the coerced sexual "swap" of women between Fitzgerald and Nygard that had just occurred.

162.   Fitzgerald and Nygard each received sexual gratification in exchange for these sexual acts.

163.   Jane Doe No. 7 received something of value in exchange for the sex acts.   Namely, she was compensated financially, maintained employment, and avoided Nygard's wrath by complying with his demands.

164.   Consequently, Jane Doe No. 7 has been physically, psychologically, financially, and/or reputationally harmed by Fitzgerald.

**H.   <u>Jane Doe No. 8</u>**

168.   Jane Doe No. 8 was trafficked when Fitzgerald engaged as an active participant in Nygard's sex trafficking venture and participated in a "sex swap" with Jane Doe No. 8 and another female.

169.   Jane Doe No. 8 was a sex trafficking victim of Nygard and the Nygard Companies.

170.   On her first trip to California, she arrived at Nygard's Marina del Rey property where her passport was confiscated.

171.   Jane Doe No. 8 was 17 years old.

172.   Nygard exploited his financial, physical, and psychological control over Jane Doe No. 8, which Fitzgerald knew about, to force her to engage in sex acts

1  with Fitzgerald.

2      173.   As such, Fitzgerald participated in and benefited from the Nygard-

3  Fitzgerald Sex Trafficking Racketeering Enterprise.

4      174.   At a dinner party at Nygard's Marina del Rey Property, she met

5  Fitzgerald and his female companion.

6      175.   Nygard directed Jane Doe No. 8 to engage in sex acts with Fitzgerald

7  against her will.

8      176.   Fitzgerald engaged in sex acts with Jane Doe No. 8 at Nygard's

9  direction and against her will.

10     177.   Fitzgerald did this on multiple occasions.

11     178.   Fitzgerald and Nygard each received sexual gratification in exchange

12 for these sexual acts.

13     179.   Jane Doe No. 8 received something of value in exchange for the sex

14 acts.   Namely, she was compensated financially, maintained employment, and

15 avoided Nygard's wrath by complying with his demands.

16     180.   Consequently, Jane Doe No. 8 has been physically, psychologically,

17 financially, and/or reputationally harmed by Fitzgerald.

18 **I.   Jane Doe No. 9**

19     181.   Jane Doe No. 9 was trafficked when Fitzgerald engaged as an active

20 participant in Nygard's sex trafficking venture and participated in a "sex swap" with

21 Jane Doe No. 9 and another female.

22     182.   Jane Doe No. 9 lived at Nygard's Marina del Rey property.

23     183.   While living at Nygard's property, Jane Doe No. 9 was repeatedly

24 required to indulge Nygard's sexual appetites against her will.

25     184.   On multiple occasions while Jane Doe No. 9 was living there,

26 Fitzgerald came to Nygard's house with a female companion.

27     185.   On one such occasion, Nygard gave his guests a tour of his home and

28 brought Fitzgerald and Jane Doe No. 9 to his bedroom.

186. Nygard instructed Jane Doe No. 9 to lie on his bed as he knelt down next to her on the bed and stated, "this is my best friend, you need to have sex with him!" referring to Fitzgerald.

187. At no point in time did Jane Doe No. 9 give her consent to Fitzgerald.

188. Fitzgerald then vaginally raped Jane Doe No. 9 while Nygard became aroused and made loud and frantic noises.

189. Nygard exploited his financial, physical, and psychological control over Jane Doe No. 9 to force her to engage in sex acts with Fitzgerald.

190. As such, Fitzgerald participated in and benefited from the Nygard-Fitzgerald Sex Trafficking Racketeering Enterprise.

191. Fitzgerald and Nygard each received sexual gratification in exchange for these sexual acts.

192. Jane Doe No. 9 received something of value in exchange for the sex acts. Namely, she was compensated financially and avoided Nygard's wrath by complying with his demands.

193. Consequently, Jane Doe No. 9 has been physically, psychologically, financially, and/or reputationally harmed by Fitzgerald.

**J.      Jane Doe No. 10**

194. Jane Doe No. 10 was trafficked when Fitzgerald forced and/or coerced her to engage in commercial sexual acts while at his residence.

195. Jane Doe No. 10's roommate was invited to a barbeque at Fitzgerald's property by one of Fitzgerald's employees.

196. Jane Doe No. 10 and her roommate attended Fitzgerald's party.

197. At the party, Fitzgerald then invited Jane Doe No. 10, her roommate, and several of the other guests to go to a "pamper party" at Peter Nygard's residence.

198. Fitzgerald provided the transportation to the "pamper party" for the attendees, to include Jane Doe No. 10.

199. At the "pamper party," Fitzgerald provided a drink to Jane Doe No. 10,

1    which, upon information and belief, was drugged.

2          200.   Jane Doe No. 10 returned to Fitzgerald's house with the other attendees.

3          201.   Jane Doe No. 10, her roommate, another woman, and Fitzgerald went

4    to the hot tub.

5          202.   After the hot tub, Fitzgerald raped Jane Doe No. 10 on his bed.

6          203.   Jane Doe No. 10 took an Uber home after the rape with her roommate.

7          204.   The next morning, Jane Doe No. 10 woke up with two $100 bills next

8    to her, which upon information and belief, were given to her by Fitzgerald after the

9    rape.

10         205.   Consequently, Jane Doe No. 10 has been physically, psychologically,

11   financially, and/or reputationally harmed by Fitzgerald.

12   **II.    Plaintiffs Were Prevented from Previously Pursuing Their Claims.**

13         206.   Defendant's and Defendant's co-conspirators' violent and ongoing

14   conduct created such extraordinary circumstances that Plaintiffs justifiably feared

15   for their well-being and their lives, and they were prevented from meaningfully

16   pursuing their claims any sooner than the date this lawsuit was filed.

17         207.   As is relevant here, where Fitzgerald engaged in sex trafficking through

18   the "swap" of Nygard's "girlfriends," Nygard and his co-conspirators and enterprise

19   associates used various methods, including payments, to silence and intimidate such

20   victims: "***In some instances, Nygard intended these payments to secure a victim's***

21   ***silence.  In other instances, Nygard intended these payments to facilitate future***

22   ***sexual activity with the victim induced through force, fraud, and coercion***." Ex. 1,

23   ¶ 13 (emphasis added).

24         208.   Fitzgerald employs even more insidious intimidation tactics, including

25   preparing YouTube videos and social media posts that accuse alleged Jane Does of

26   being felons and posting private information to silence them.

27         209.   Nygard and his co-conspirators and enterprise associates cultivated a

28   decades-long and industry-wide reputation, known to Plaintiffs, for silencing those

who would speak out against them. The DOJ Indictment details the psychological coercion and manipulation that the Nygard enterprise uses to silence its victims: "Nygard maintained control over his victims through threats, promises to grant or withhold modeling opportunities and other career advancement, granting and withholding of financial support, and by other coercive means, including constant surveillance, restrictions of movement, and physical isolation." *Id.*, ¶ 12.

210.  Indeed, it was widely reported, and known to Plaintiffs, that many victims had sought help through law enforcement and through the Nygard Companies, but were rebuffed, intimidated, silenced, and destroyed.  The DOJ Indictment states that Nygard and other members of the Nygard enterprise "engaged in obstructive conduct aimed at preventing witnesses from reporting Nygard's sexual crimes." *Id.*, ¶ 3.  Fitzgerald is actively doing the same right now.

211.  Such intimidation includes not only direct threats, but also the publicly known, decades-long reputation for silencing those who would speak out against Nygard and his co-conspirators and enterprise associates, such as Defendant – a reputation known to Plaintiffs and indeed known throughout the fashion industry and the entire social scene in which Nygard, Defendant, and their victims traveled. In the Canadian Arrest Warrant related to the DOJ Indictment and Extradition of Peter Nygard, evidence is put forth that Nygard and the Nygard enterprise used "corporate employees and funds to quash negative publicity related to allegations of sexual assault and sex trafficking and to engage in illegal witness tampering." *See* annexed Ex. 2, at ¶ 7(s)(vi).  Fitzgerald's defamatory videos and social media posts are all intimidating witness tampering techniques with malicious intent.

212.  In a January 5, 2021 letter, acting United States Attorney for the Southern District of New York, Audrey Strauss, stated: "Moreover, during the past several decades, Nygard has repeatedly engaged in efforts to obstruct justice and tamper with potential witnesses against him.  These efforts have included paying witnesses to provide information that Nygard knew to be false, monitoring contact

between victims and U.S. law enforcement, and providing false information to witnesses, including those Nygard knew had been contacted by U.S. law enforcement." *See* annexed Ex. 3, at p. 2. Similarly, Fitzgerald stalked an alleged Jane Doe to try to determine if she had spoken to the FBI and trying to silence her.

213. Nygard and his co-conspirators and enterprise associates, including Defendant, engage in myriad coercive methods of intimidation, bribery, and witness tampering, including as recently as 2019 and 2020, in order to suppress the truth about Nygard's sex trafficking conspiracy, including as it relates to Plaintiffs:

*Obstruction of justice/witness tampering* –

(aa) ***During the past several decades, NYGARD has also repeatedly engaged in efforts to obstruct justice and tamper with potential witnesses against him. These efforts have included paying witnesses to provide false information***, monitoring contact between victims and U.S. law enforcement, and ***providing false information to witnesses, including those NYGARD knew had been contacted by U.S. law enforcement***; Examples include:

(i) In or about 2016, after learning about a federal criminal investigation, NYGARD directed Victim-6 to provide testimony establishing that Minor Victim-1 was an adult under U.S. law, when she travelled with NYGARD. Victim-6, who believed at the time that Minor Victim-1 was 18 or older, agreed, and offered sworn statements at what she understood to be a civil deposition. After NYGARD subsequently rewarded her with a $2,000 cash bonus, she later learned that Minor Victim-1 was under age 18;

(ii) Messages recovered from NYGARD's phone demonstrate that in or about December of 2019, a witness who had been lawfully served by the FBI with a subpoena ("Female-2") sent NYGARD a photograph of the FBI agent's business card. About 20 days later, NYGARD sent Female-2 another message falsely telling her that the agent was a "fake.";

\* \* \*

1

(iii) ***Another longtime "girlfriend" ("Female-3") advised***
2
***Victim-3 that in the summer of 2020, after the U.S.***
***investigation had been revealed, NYGARD contacted Female-***
3
***3 from another person's phone to convey, in substance, that if***
***she were not on his "side" then she was "going down."***
4

5   Ex. 2 at ¶¶ 18-19 (emphasis added).

6       214.   Due to the violent nature of rape and the brutal methods of abuse and

7   psychological coercion and manipulation employed by Nygard, Fitzgerald, and other

8   associates of the Nygard enterprise against Plaintiffs, along with the coordinated

9   methods of control, coercion, fraud, and intimidation, Plaintiffs legitimately

10  feared—and continue to fear—for their lives.

11      215.   As noted above, Defendant, Nygard, and the Nygard enterprise also use

12  violence, threats of violence, bribery, and corruption to intimidate and silence their

13  victims and those that they believe have "betrayed" them.  Defendant, Nygard, and

14  the Nygard enterprise have silenced their victims by, among other means, having

15  their tires slashed, committing arson, hiring thugs to intimidate their victims, having

16  their victims followed, engaging in murder-for-hire plots, threatening them via social

17  media and other mediums, and otherwise threatening their victims with death.

18      216.   Moreover, Nygard's and the Nygard enterprise's intimidation in the

19  form of coordinated displays of power and international influence, both monetary

20  and political, have continuously led Nygard's and the Nygard enterprise's many

21  victims, which include Plaintiffs here in coordinated assaults by Nygard and

22  Defendant, to believe that they would have no safe or effective avenue for relief for

23  pursuing their claims.

24      217.   Nygard's confirmed and alleged payoffs to law enforcement in the

25  Bahamas and Canada, repeated statements to victims such as, "I own the police,"

26  and his hiring of Bahamian police officers as security guards for his pamper parties

27  and other events at Nygard Cay at which women and girls were drugged and raped,

28

1    all served to send a clear and consistent message to victims that they would not be
2    safe to report their victimization to law enforcement.

3          218.   Plaintiffs knew they could be found and harmed at any time by Nygard,
4    Defendant, or their other associates in the Nygard enterprise, as it was routine
5    practice for Nygard to keep victims' passports and other identification, or copies
6    thereof, in his private possession, typically in a locked cabinet.

7          219.   Plaintiffs feared—and continue to fear—for their livelihood and safety.

8          220.   The crimes here were committed by both Nygard and Fitzgerald, who
9    conspired with each other to traffic Plaintiffs, thus invoking the fear based on the
10   Nygard enterprise's sprawling intimidation machine.

11         221.   This control, manipulation, and intimidation rendered Nygard's and
12   the Nygard enterprise's victims, which include Plaintiffs here, effectively
13   incapacitated from being able to understand and assert their rights.  Plaintiffs thus
14   have been effectively prevented until now from exercising their rights to confront
15   Defendant, Nygard, and the Nygard Companies – prevented until they were assured
16   that authorities were investigating the Nygard enterprise's crimes in earnest, that
17   their identities would be protected, and, ultimately, that Nygard and his enterprise
18   would not be free to wield their considerable influence to harm them for pursuing
19   justice against him and his co-conspirators.

20         222.   The violent nature of rape and the brutal methods of abuse,[8] along with
21   the coordinated methods of coercion and intimidation by Nygard and co-
22   conspirators, caused Plaintiffs significant mental and emotional harm such that they
23
24
25

_____

26   [8] "Rape is one of the most severe of all traumas, causing multiple, long-term negative outcomes,
     such as post-traumatic stress disorder (PTSD), depression, substance abuse, suicidality, repeated
27   sexual victimization, and chronic physical health problems." Kilpatrick, D. G., & Acierno, R.:
     "Mental health needs of crime victims: Epidemiology and outcomes." Journal of Traumatic Stress,
28   Vol. 16, 2003, pp119–132.

felt they could not re-traumatize[9][10] themselves or further endanger themselves by going up against powerful men, backed by global corporations and corruption. "[T]he trauma experienced by victims of trafficking includes anxiety, depression, alienation, disorientation, aggression, suicide ideation, attention deficit, and post-traumatic stress disorder (PTSD)."[11] Further, that "trauma worsens during the trafficking process and persists far beyond the end of any exploitation."[12]

223.   Studies show that rape is one of the least reported of all violent crimes in the United States and that victims do not report because of fear of retaliation from their perpetrator.

224.   Studies also show that negative social consequences to disclosing rape to family members and friends form significant inhibitions, further incapacitating victims to speak about their experiences even to people they love and trust.  These include notions of becoming an emotional burden, experiencing a loss of privacy, being shamed and blamed, being disbelieved, being labelled (and as such, being unable to move out from under a negative label, such as "victim," "whore," "dirty," "tainted," "weak"), and being the cause of mental and emotional strife for the person/people they disclose to.

225.   It is also common for rape survivors to fear violent retaliation against their attacker by family members and friends, particularly male.  Thus, they will avoid disclosing their victimhood in order to ensure that their brothers, fathers,

---

[9] "When victims reach out for help, they place a great deal of trust in the legal, medical, and mental health systems as they risk disbelief, blame, and refusals of help. How these system interactions unfold can have profound implications for victims' recovery."  Campbell, Rebecca, "The Psychological Impact of Rape Victims' Experiences With the Legal, Medical, and Mental Health Systems," American Psychologist, November 2008, p. 702.

[10] "Post-assault help seeking can become a "second rape," a secondary victimization to the initial trauma."  Campbell, R., & Raja, S., "The secondary victimization of rape victims: Insights from mental health professionals who treat survivors of violence." *Violence & Victims, 14,* 2008, 261–275.

[11] Okech, David, *et. al.*, "Social Support, Dysfunctional Coping, and Community Reintegration as Predictors of PTSD Among Human Trafficking Survivors."  Behavioral Medicine, Vol. 44, 2018, 209-218).

[12] *Id.*

husbands and other male friends and relatives do not cause physical harm to their rapists which would in turn put those friends and relatives at risk of being charged and convicted of criminal offences themselves.  This is best illustrated in victims' responses to interview questions by lawyers, law enforcement and therapists such as, "Why didn't you tell anyone?"   Victim response: "I knew my dad/brother/boyfriend would find him and kill him, so I kept it to myself.  I didn't want [relative] to go to jail."

226.   The DOJ Indictment corroborates that the Nygard enterprise employed various resources "to intimidate, threaten, and corruptly persuade individuals who alleged that Nygard was engaged in sexual assault and sex trafficking in the United States, Bahamas, Canada and elsewhere, including by paying witnesses for false statements and affidavits; threatening witnesses with arrest, jail, prosecution, civil litigation, and reputational harm; and attempting to cause reputational harm and discredit potential witnesses by disseminating false or embarrassing information." Ex. 1 at ¶ 10(h).

227.   In this case, Defendant has already indicated his intention to "out" Plaintiff Jane Doe Nos. 1-10 and discredit them by claiming they have brought this case not for the truth, but rather, because they are simply "looking for a payday." Fitzgerald has, in fact, already made good on this by posting, or causing to be posted, to YouTube a false and defamatory video concerning Jane Doe Nos. 4-6 and by creating and distributing defamatory flyers concerning Jane Doe No. 5 throughout her community.

228.   Because of the actions by Nygard and other associates of the Nygard enterprise, including Defendant, victims reasonably fear for their lives, particularly given the violent nature of the crimes, the reasonable belief that attempting to report such crimes is hopeless, and the careful coordination by the Nygard enterprise of the methods of violence and intimidation, including false imprisonment, drugging, and threats.

229.   Likewise, in accordance with the practices of the Nygard enterprise, Fitzgerald himself has used violence against his victims to force their silence and acquiescence.

230.   Cases associated with the Nygard Sex Trafficking Racketeering Enterprise involving Nygard and Defendant Fitzgerald present a unique set of circumstances that require a unique perspective.  The confluence of myriad factors, listed below, led each of the Jane Does to a legitimate fear for her and her family's livelihood, safety, and well-being, thus incapacitating Plaintiffs from practically and effectively understanding and asserting their rights.  The factors eliciting fears of death, bodily and psychological harm, and other grievous injury in this case are:

    a.   The Nygard enterprise's wealth and connection to prominent politicians and law enforcement agents in multiple nations;

    b.   Nygard's and Fitzgerald's brutal and coordinated violent rapes;

    c.   Nygard instructing and coercing women to have sex with his close friend and co-conspirator, Fitzgerald;

    d.   Fitzgerald's wealth and use of violence to suppress his victims;

    e.   Fitzgerald's indifference to the rules of law by his rape and trafficking of women;

    f.   Nygard's and Fitzgerald's utter indifference to the rules of law by their brazen violent acts;

    g.   Nygard's abilities to manipulate and control people, honed by his own malignant narcissism, as well as his relentless study of dictators such as Hitler and cult leaders such as Jim Jones;

    h.   Nygard's, Fitzgerald's, and the Nygard enterprise's sprawling infrastructure of employees and "girlfriends" that, to please Nygard and/or avoid reprisal by him, enticed, lured, recruited, transported, harbored, maintained, and intimidated witnesses;

i.  The Nygard enterprise's active intimidation tactics, including constant surveillance and other harassment measures; and

j.  The Nygard enterprise's known connections to organized crime and other underground figures, such as drug dealers, murderers, and gang members (demonstrated poignantly by Hell's Angel associate and convicted drug trafficker, Steve Mager, being one of two people recently attempting to post surety to allow for Nygard's release from jail).

231.  Further, Nygard and his conspirators and enterprise associates actively coordinated to brainwash, shame, intimidate, and terrify victims, including Plaintiffs, into a cult-like, paralyzing fear that prevented them from being able to understand and/or assert their rights prior to filing this suit.  Nygard and his conspirators honed patterns of praise-berate-reward-punish behaviors that pulled victims into a control cycle of adjusting their responses to such behaviors in order to elicit the positive and avoid the negative, to the point that some became unable at various points to know right from wrong, or to distinguish between helpers and harmers.  This allowed victims, including Plaintiffs, to be held as indentured laborers by what are known in trafficking lingo as "the invisible chains," and to remain devoid of the knowledge or understanding that what was happening to them was indeed criminal.

232.  Nygard's control of people, particularly his "girlfriends" such as Plaintiffs, was complete and ruthless.  He would withhold passports, payment, travel, and lodging, unless his every demand was met.  He monitored and restricted food intake and employed sleep deprivation tactics as further methods of psychological control.  He disallowed privacy, constantly surveilling and recording his "girlfriends'" and employees' every activity.  Any protest or attempt to fight back was met with swift and cruel retribution, including physical and sexual assaults.

233.   Further, even after his victims leave his direct control, Nygard often continues to attempt to contact them, in an intimidating manner, intending to instill fear in his victims and remind them of his power and ability to hurt them.

234.   In some cases, such as with Jane Doe No. 4, instead of letting this victim leave his control, Nygard instead "passed" her to Fitzgerald for further manipulation, control, sex trafficking, and abuse.   Consequently, instead of being free of her trafficker, Jane Doe No. 4 was trafficked and further abused within the criminal enterprise by Fitzgerald.

235.   Further, the convoluted structure of the enterprise and scheme alone, including the murky corporate waters of the Nygard Companies, as well as the labyrinth of covert recruiters, obfuscated the true nature of the racketeering enterprise, thus concealing the true landscape from victims, including Plaintiffs.

236.   To wit, some victims have reported continuing to believe that their recruiters were their friends for years following their trafficking and sexual assault. Those who got caught for any length of time in Nygard's scheme often came to believe that he cared about them, since he frequently pointed out how lucky they were to have the opportunities for career growth, travel, and industry connections that he claimed to be providing. Typically, it is only through psycho-education about trafficking given by experts (therapists, lawyers, victim advocates, law enforcement), or through learning about the trafficking experiences of others in books, film, and media that trafficking victims enlighten to the fact that their "friend," "boyfriend," "agent," or "employer," was actually a pimp, recruiter, or trafficker.

237.   Due to the temporal, geographical, and numerical breadth of Nygard's and Defendant's schemes, and due to the success of Nygard's and Defendant's efforts to suppress knowledge and conceal information about their schemes, and due to Plaintiffs' justifiable lack of knowledge of such facts until now, it would have

been impossible for Plaintiffs to know or understand many of the claims they have against Defendant, Nygard, or the Nygard Companies.

238.   Plaintiffs largely were not aware of the wide-ranging scheme of abuse outside of their own victimization, and thus could not have known of a broader RICO enterprise or trafficking scheme – in part due to ignorance of the legal protections available to them and in part due to Defendants' concerted efforts to obfuscate their crimes.

239.   Compounding the belief that they were alone in their victimization are the negative cognitions of self (*i.e.*, "I am powerless," "I am worthless," "It's my fault," "I'm stupid," "I'm dirty") that form in response to trauma, particularly sexual trauma. These beliefs combine with anticipated social reactions and consequences (such as people impugning their motives if they do come forward) to play a significant psychological role in immobilizing the victim from coming forward.[13]

240.   Nygard and his conspirators and enterprise associates stepped up their intimidation tactics in the last two years.  In the summer of 2019, Nygard became aware that the *New York Times* was actively investigating his sex trafficking venture and racketeering enterprise.

241.   Nygard also became aware that the FBI and DOJ were investigating his sex trafficking venture and racketeering enterprise when they raided his New York and California properties on February 26, 2020.

242.   In response, Nygard took several offensive measures to try to keep his sex trafficking venture and racketeering enterprise concealed, including threatening the *New York Times*, suing the *New York Times*, concocting false conspiracy theories, and enlisting his most trusted "girlfriends" and associates to cover-up his and their crimes.  Upon information and belief, these individuals were paid

---

[13] Ahrens, Courtney, "Being Silenced: The Impact of Negative Social Reactions on the Disclosure of Rape," American Journal of Community Psychology, Vol. 38, 2006, pp. 263-274.

1  thousands of dollars in cash and benefits during 2019 and 2020 to keep quiet and lie
2  for Nygard.

3  243.   The intimidation tactics of Nygard are acutely relevant in this case
4  because Jane Does here are the victims of a conspiracy between Nygard and
5  Fitzgerald to sex traffic, rape, sexually assault, and/or sexually batter them.  Both
6  Nygard and Fitzgerald are complicit and liable for the acts herein alleged.

7  244.   Further, prior to Nygard's indictment by the U.S. federal government
8  and arrest, Defendant communicated with Nygard on options to flee the jurisdiction
9  and get to a country without extradition treaties to the U.S.

10  245.   Due to Defendant's conspiracy and enterprise with Nygard, and his
11  close association with him as a recruiter and fellow sex trafficker, Plaintiffs
12  legitimately feared for their lives as well as other forms of retaliation if they pursued
13  claims against Defendant for trafficking them.

14  **CLAIMS ALLEGED**
15  **COUNT I**
16  **VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION ACT,**
17  **18 U.S.C. § 1595**

18  246.   Plaintiffs reallege and incorporate by reference the allegations
19  contained in paragraphs 1-245, as if fully set forth in this Count.

20  247.   Plaintiffs are victims of violations of Chapter 77 of Title 18 of the
21  United States Code, to wit, 18 U.S.C. § 1591(a), insofar as:

22          a)      Fitzgerald, Nygard, the Nygard Companies, and others acting in
23  concert with them knowingly recruited, enticed, harbored, transported, provided,
24  obtained, maintained, patronized, and/or solicited Plaintiffs by multiple means to
25  commit one or more commercial sex acts [as defined at 18 U.S.C. § 1591(e)(3)];

26          b)      Fitzgerald, Nygard, the Nygard Companies, and others acting in
27  concert with them knowingly benefitted, financially or by receiving anything of

28

1  value, from participation in a venture [as defined at 18 U.S.C. § 1591(e)(4)] which

2  has engaged in an act described in (a) in which Plaintiffs were the victims;

3        c)     the acts described in (a) and (b) involving Plaintiffs occurred in

4  or affected interstate or foreign commerce, or within the special maritime and

5  territorial jurisdiction of the United States; and

6        d)     Fitzgerald, Nygard, the Nygard Companies, and others acting in

7  concert with them committed the acts described in (a) and (b) knowing, or in reckless

8  disregard of the fact, that means of force, threats of force, fraud, coercion [as defined

9  at 18 U.S.C. § 1591(e)(2)], or any combination of such means would be used to

10 cause Plaintiffs to engage in one or more commercial sex acts.

11       248.   Plaintiffs are victims of violations of Chapter 77 of Title 18 of the

12 United States Code, to wit, 18 U.S.C. § 1591(d), insofar as Fitzgerald, Nygard, the

13 Nygard Companies, and others acting in concert with them obstructed, attempted to

14 obstruct, and/or interfered with or prevented the enforcement against them of 18

15 U.S.C. § 1591 in connection with their actions of which Plaintiffs were victims.

16       249.   Plaintiffs were forced to engage in commercial sex acts as defined at 18

17 U.S.C. § 1591(e)(3).

18       250.   Within the meaning of 18 U.S.C. § 1595, Defendant Fitzgerald is a

19 perpetrator of the violations of 18 U.S.C. § 1591 set forth above in which Plaintiffs

20 were victims:

21       a)     Fitzgerald, acting alone and in concert with others, knowingly

22 recruited, enticed, harbored, transported, provided, obtained, maintained,

23 patronized, and/or solicited Plaintiffs by multiple means to commit one or more

24 commercial sex acts [as defined at 18 U.S.C. § 1591(e)(3)];

25       b)     Fitzgerald, acting alone and in concert with others, knowingly

26 benefitted, financially or by receiving anything of value, from participation in a

27 venture [as defined at 18 U.S.C. § 1591(e)(4)] which has engaged in an act described

28 in (a) in which Plaintiffs were the victims;

c)      Fitzgerald, acting alone and in concert with others, committed the acts described in (a) and (b) knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud, coercion [as defined at 18 U.S.C. § 1591(e)(2)], or any combination of such means would be used to cause Plaintiffs to engage in one or more commercial sex acts; and

d)      Fitzgerald, acting alone and in concert with others, obstructed, attempted to obstruct, and interfered with or prevented the enforcement against them of 18 U.S.C. § 1591 in connection with their actions of which Plaintiffs were the victims.

251.   Defendant's violation of 18 U.S.C. § 1591, giving rise to a cause of action under 18 U.S.C. § 1595, has continued without interruption since Defendant first met Plaintiffs.

252.   Defendant's conduct has caused and continues to cause Plaintiffs serious and permanent harm, including, without limitation, physical, nonphysical, psychological, financial, and reputational harm.

253.   Under the TVPRA, 18 U.S.C. § 1595, Plaintiffs are entitled to recover from Defendant damages and reasonable attorney's fees.

## COUNT II

### PARTICIPATING IN A VENTURE IN VIOLATION OF
### THE TRAFFICKING VICTIMS PROTECTION ACT, 18 U.S.C. § 1595

254.   Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1-245, as if fully set forth in this Count.

255.   Defendant participated in a venture with Nygard and the Nygard Companies, in violation of 18 U.S.C. § 1591(a)(2).

256.   Defendant knowingly benefited from, and received value for, his participation in the venture, in which Defendant and Nygard would lure, entire, recruit, solicit, provide, obtain, and transport Plaintiffs, to engage in commercial sex acts with Defendant.

257.   Defendant knew, or was in reckless disregard of the fact, that it was Nygard's pattern and practice to use the channels and instrumentalities of interstate and foreign commerce, as well as the Nygard Companies' resources, to entice, recruit, solicit, or cause young and underage individuals to engage in commercial sex acts, and offering something of value in exchange for the sexual act.

258.   Defendant had actual knowledge that he was facilitating and participating in Nygard's use of company resources to recruit, entice, harbor, transport, provide, obtain, maintain, patronize, and/or solicit Plaintiffs and others, through force, fraud, or coercion, into commercial sex acts.

259.   Despite such knowledge, Defendant facilitated and participated in Nygard's violations of 18 U.S.C. § 1591, where Defendant knew, or was in reckless disregard of the facts that, Nygard would lure, entice, harbor, transport, provide, obtain, maintain, patronize, and/or solicit Plaintiffs, through force, fraud, or coercion, to engage in commercial sex acts.

260.   Defendant and/or Defendant's co-conspirators also provided or promised Plaintiffs items of value in exchange for engaging in the sexual acts with Defendant, including flights, lodging, and cash.

261.   In exchange for facilitating, participating in, and covering up Nygard's scheme, Defendant received significant financial benefits and online exposure to promote and grow his own company.

262.   Defendant's conduct has caused and continues to cause Plaintiffs serious and permanent harm, including, without limitation, physical, nonphysical, psychological, financial, and reputational harm.

## COUNT III

**CONSPIRACY TO COMMIT VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION ACT, 18 U.S.C. § 1595**

263.   Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1-245, as if fully set forth in this Count.

264.   Defendant conspired, by agreement or understanding, to further Nygard's unlawful plan and/or purpose to commit illegal commercial sex acts with Plaintiffs.

265.   Defendant committed overt acts in furtherance of the agreement or understanding by playing an active role in trafficking Plaintiffs and by engaging in commercial sex acts with them.

266.   Defendant and/or his co-conspirators provided or promised Plaintiffs items of value in exchange for engaging in the sexual acts with Defendant, including but not limited to, air flights, lodging, food, and cash.

267.   Defendant's participation in the furtherance of Nygard's illegal sex trafficking venture, plan, and/or purpose was intentional and/or willful and, therefore, Defendant intentionally and/or willfully caused Nygard's facilitation of the sex acts with Plaintiffs in his affirmative acts supporting Nygard.

268.   Defendant knew that his acts and conduct supporting and facilitating Nygard would lead to unlawful commercial sex acts facilitated by Nygard and involving Plaintiffs.

269.   Defendant conspired with Nygard through his affirmative acts and provided substantial support to Nygard causing commercial sex acts upon Plaintiffs.

270.   Defendant's conduct has caused and continues to cause Plaintiffs serious harm, including, without limitation, physical, psychological, financial, and reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

/ / /

/ / /

/ / /

/ / /

# COUNT IV

## SEXUAL BATTERY IN VIOLATION OF CALIFORNIA CIVIL CODE § 1708.5 AND COMMON LAW

271. Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1-245, as if fully set forth in this Count.

272. Defendant intentionally committed sexual battery on all Plaintiffs in the State of California in violation of California law.

273. Defendant acted with the intent to cause a harmful and offensive contact with an intimate part of each Plaintiff, and a sexually offensive contact with each Plaintiff directly or indirectly resulted.

274. Defendant acted with the intent to cause a harmful and offensive contact with each Plaintiff, by use of his intimate parts, and a sexually offensive contact with each Plaintiff directly or indirectly resulted.

275. Defendant also acted to cause an imminent apprehension or fear of a harmful and offensive contact with each Plaintiff's intimate parts.

276. Plaintiffs did not consent to Defendant's harmful and offensive contact and/or were coerced in to such harmful and offensive contact.

277. Plaintiffs were harmed and/or offended by Defendant's conduct. Defendant's conduct has caused Plaintiffs serious and permanent harm and/or damages, including, without limitation, physical, psychological, emotional, financial, and reputational harm.

# COUNT V

## CIVIL CONSPIRACY IN VIOLATION OF CALIFORNIA LAW

278. Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1-245, as if fully set forth in this Count.

279. Defendant, Nygard, and the Nygard Companies have participated in the continuing conspiracy to commit sexual battery and to cover-up their conspiracy.

280. Defendant, Nygard, and the Nygard Companies formed a group of two

41

or more persons who conspired and agreed to a common plan or design to commit tortious acts, including sexual battery.

281.   Defendant had actual knowledge that tortious acts including sexual battery were planned by him and his co-conspirators, and he concurred and participated in the tortious scheme with knowledge of its unlawful purpose.

282.   Defendant intended to aid his co-conspirators in the commission of the planned tortious acts, including sexual battery.

283.   Defendant committed numerous wrongful acts, including sexual battery, against Plaintiffs in the State of California pursuant to his agreement with his co-conspirators.

284.   Defendant's affirmative conduct in furtherance of the conspiracy was undertaken with the express and/or implied agreement or understanding that Nygard would use the Nygard Companies' money and brand, the promise of modeling careers, and his influence in the fashion industry to facilitate and/or enable the sexual battery of Plaintiffs.

285.   Plaintiffs were battered and damaged as a direct result of Defendant's agreement and actions in furtherance of the conspiracy.

286.   Defendant's conduct has caused and continues to cause Plaintiffs serious and permanent harm and/or damage, including, without limitation, physical, psychological, emotional, financial, and reputational harm.

## COUNT VI

### LIBEL IN VIOLATION OF
### CALIFORNIA CIVIL CODE § 45

287.   Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1-245, as if fully set forth in this Count.

288.   Defendant intentionally published, or caused to be published, false and harmful statements about Jane Doe Nos. 4, 5, and 6, with knowledge of their falsity, on the internet for public viewing, including accusing them of criminal activity and

1  sexual misconduct, among other things.

2  289.  Additionally, Defendant intentionally and knowingly created and
3  printed paper flyers portraying Jane Doe No. 5's photograph and name along with
4  false and harmful statements about her, accusing her of criminal activity, and he has
5  distributed these around the community in which Jane Doe No. 5 currently resides.

6  290.  Defendant's publication of such false statements has offended
7  Plaintiffs, exposed them to contempt and ridicule, and caused them serious and
8  irreparable harm and/or damages, including, without limitation, psychological,
9  emotional, financial, professional, and/or reputational harm.

10  ## COUNT VII

11  ## LIBEL PER SE IN VIOLATION OF
12  ## CALIFORNIA CIVIL CODE § 45-a

13  291.  Plaintiffs reallege and incorporate by reference the allegations
14  contained in paragraphs 1-245, as if fully set forth in this Count.

15  292.  Defendant intentionally published, or caused to be published, false and
16  harmful statements about Jane Doe Nos. 4, 5, and 6, with knowledge of their falsity,
17  on the internet for public viewing, including accusing them of criminal activity and
18  sexual misconduct, among other things.

19  293.  Additionally, Defendant intentionally and knowingly created and
20  printed paper flyers portraying Jane Doe No. 5's photograph and name along with
21  false and harmful statements about her, accusing her of criminal activity, and he has
22  distributed these around the community in which Jane Doe No. 5 currently resides.

23  294.  Defendant's publication of such false statements has offended
24  Plaintiffs, exposed them to contempt and/or ridicule, and, as the statements falsely
25  accuse plaintiffs of sexual misconduct and/or criminal activity, they are defamatory
26  on their face.

27  / / /

28  / / /

## **REQUEST FOR RELIEF**

Plaintiffs respectfully request that the Court enter judgment in their favor, and against Defendant, as follows:

a.      That the Court grant permanent injunctive relief to prohibit Defendant from continuing to engage in the unlawful acts and practices described herein;

b.      That the Court award Plaintiffs compensatory, consequential, general, and normal damages in an amount to be determined at trial;

c.      That the Court award punitive or exemplary damages in an amount to be determined at trial;

d.      That the Court award to Plaintiffs the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

e.      That the Court award pre- and post-judgment interest at the maximum legal rate; and

f.      That the Court grant all such other relief as it deems just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all claims so triable.


Dated: October 30, 2021        By:      */s/ Deborah S. Dixon*
                                         John H. Gomez
                                         Deborah S. Dixon
                                         **GOMEZ TRIAL ATTORNEYS**

                                         Greg G. Gutzler (*pro hac vice* pending)
                                         **DiCELLO LEVITT GUTZLER LLC**

                                         Lisa D. Haba (*pro hac vice*)
                                         **THE HABA LAW FIRM, P.A.**

                                         ***Counsel for Plaintiffs***

# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - X
                                     :
UNITED STATES OF AMERICA             :
                                     :
            - v. -                   :       SEALED INDICTMENT
                                     :
PETER NYGARD,                        :       20 Cr. **624**  (___)
                                     :
            Defendant.               :
                                     :
- - - - - - - - - - - - - - - - - - X

## COUNT ONE

### (Racketeering Conspiracy)

The Grand Jury charges:

### Background

1.    At all times relevant to this Indictment, PETER
NYGARD, the defendant, was the leader and founder of an
international clothing design, manufacturing, and supply business
headquartered in Winnipeg, Canada, with major offices and
warehouses in the United States, including New York City and
California.  The fashion business has multiple product lines and
brands, many of which bear variants on the name "Nygard."

2.    At all times relevant to this Indictment, PETER
NYGARD, the defendant, operated a constellation of corporate
entities organized in various countries, including Canada, the
United States, the Bahamas, Barbados, and Hong Kong (the "Nygard
Group").  Certain of the Canadian and U.S. entities in the Nygard
Group directly operate NYGARD's fashion business.

3.    At all times relevant to this Indictment, PETER NYGARD, the defendant, and others known and unknown, including employees of the Nygard Group, used company funds, employees, resources, and influence to recruit, entice, transport, harbor, and maintain adult and minor-aged female victims for NYGARD's sexual gratification and, on occasion, the gratification of NYGARD's personal friends and business associates by, among other things, sex trafficking, interstate and international transport for purposes of engaging in prostitution and other illegal sexual activities, and related offenses.   NYGARD, and others known and unknown, including employees of the Nygard Group, used force, fraud, and coercion to cause women to engage in commercial sex with NYGARD and others, and to remain with NYGARD against their will.   NYGARD, and others known and unknown, including employees of the Nygard Group, have engaged in obstructive conduct aimed at preventing witnesses from reporting NYGARD's sexual crimes.

### The Nygard Enterprise

4.    The Nygard Enterprise, including its leadership, its membership, and its associates, constitutes an "enterprise" as defined in Title 18, United States Code, Section 1961(4), that is, a group of entities and individuals associated in fact. The Nygard Enterprise ("Nygard Enterprise" or the "Enterprise") consists of: (i) PETER NYGARD, the defendant; (ii) entities within the Nygard Group, including but not limited to Nygard, Inc. (a United States

2

entity), Nygard International Partnership (a Canadian entity), and Nygard Holdings, Ltd. (a Bahamian entity); (iii) individuals employed by the Nygard Group; and (iv) others known and unknown.

5.    The Enterprise constitutes an ongoing organization whose members function as a continuing unit for the common purpose of achieving the objectives of the Enterprise. The Nygard Enterprise operates in the Southern District of New York and elsewhere.   At all times relevant to this Indictment, the Enterprise has engaged in, and its activities affected, interstate and foreign commerce.

### Purposes of the Enterprise

6.    The purposes of the Enterprise included the following:

a.    Operating an international clothing design, manufacturing, and supply business;

b.    Preserving, protecting, promoting, and enhancing the power, reputation, and profits of the Enterprise;

c.    Enriching members and associates of the Enterprise, including PETER NYGARD, the defendant, who was the leader of the Enterprise; and

d.    Preserving, protecting, promoting, and enhancing the reputation of PETER NYGARD, the defendant.

### Purposes of Nygard and His Co-Conspirators

7.   The purposes of PETER NYGARD, the defendant, and his co-conspirators in the racketeering conspiracy were to use the façade of legitimacy created by the Enterprise, as well as the Enterprise's business operations, reputation, and resources, to facilitate and to conceal their racketeering activity, including sex trafficking, interstate and international transport for purposes of engaging in prostitution and other illegal sexual activities, and related offenses.

### The Racketeering Conspiracy

8.   From at least in or about 1995, up to and including in or about 2020, in the Southern District of New York and elsewhere, PETER NYGARD, the defendant, and others known and unknown, being persons employed by and associated with the Enterprise described in Paragraphs One through Six of this Indictment, knowingly combined, conspired, confederated, and agreed together and with each other to violate the racketeering laws of the United States, to wit, Section 1962(c) of Title 18, United States Code, that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Enterprise, which was engaged in, and the activities of which affected, interstate and foreign commerce, through a pattern of racketeering activity consisting of:

4

Multiple acts indictable under:

a. Title 18, United States Code, Sections 1591 and 2 (sex trafficking of minors and by force, fraud and coercion);

b. Title 18, United States Code, Sections 2421 and 2 (transportation for purposes of prostitution and other illegal sexual activities);

c. Title 18, United States Code, Sections 1512 and 2 (obstruction of justice); and

d. Title 18, United States Code, Sections 1956 and 2 (money laundering).

9. It was a part of the conspiracy that the defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the Enterprise.

Means and Methods of the Racketeering Conspiracy

*Overview*

10. PETER NYGARD, the defendant, and others known and unknown, used various means and methods to solicit NYGARD's victims, who were then forcibly sexually assaulted, drugged, and/ or coerced into sexual contact with NYGARD. NYGARD and other Nygard Group employees also transported victims over state and international lines, at NYGARD's sole direction and authority, for sex with NYGARD. Among the means and methods by which NYGARD and others pursued their illegal purposes were the following:

5

a.    Using the ruse of modeling and other fashion industry jobs or other career advancement in order to lure victims into NYGARD's orbit and to keep them there.

b.    Using Nygard Group funds to pay for "Pamper Parties" -- named for the free food, drink, and spa services that NYGARD made available at such parties -- and other victim recruitment tools, to pay sexual partners, often referred to as "girlfriends," some of whom were victims of NYGARD, and to pay for various expenses for "girlfriends," including travel, living expenses, dental work, immigration assistance, plastic surgery, abortions, child support, and medical treatments. Payments to "girlfriends" and other victims were often thinly disguised as payroll or payments for professional contracts, with the "girlfriends" sometimes identified as models, personal assistants, or "ComCor," employees, a Nygard Group shorthand for "communications coordinator."

c.    Using Nygard Group employees to organize Pamper Parties and other victim-recruitment events, directly recruit victims, arrange travel for "girlfriends" and other victims, manage payments to "girlfriends," and manage the payment of "girlfriend" and victim-related expenses.

d.    Using Nygard Group employees, including members of ComCor, to recruit women and girls to attend Pamper Parties, dinners, and poker games by sending invitations and

6

follow-up communications to prospective guests and to associates of NYGARD, who also recruited victims to come to the events. ComCor employees screened attendees for their physical appearance to confirm that they would appeal to NYGARD before allowing them onto a NYGARD property.  They also photographed attendees and maintained a register of personal information of all attendees, documenting, among other things, attendees' names, contact information, weights, and physical measurements.

        e.  Using corporate travel employees of the Nygard Group and other Nygard Group resources, including a private plane, to arrange interstate and international travel for "girlfriends" and other victims.  Nygard Group employees kept records of these travel itineraries and of travel documents for "girlfriends" and other victims, including copies of adult victims' passports and, in at least one case, a copy of a minor victim's passport.

        f.  Using Nygard Group employees for property management, security services, and as drivers.  In these capacities, Nygard Group Employees arranged accommodations for "girlfriends," facilitated Pamper Parties, dinners, and poker games used to recruit and abuse victims, and controlled access to and from NYGARD's properties, including refusing to let women and girls, including "girlfriends," leave without NYGARD's approval. Drivers were also responsible for transporting NYGARD and "girlfriends" to swingers' clubs.

7

g.   Using Nygard Group employees and funds to garner good publicity and to quash negative publicity related to allegations that NYGARD raped or assaulted women and girls.

h.   Using Nygard Group employees and funds to intimidate, threaten, and corruptly persuade individuals who alleged that NYGARD was engaged in sexual assault and sex trafficking in the United States, Bahamas, Canada, and elsewhere, including by paying witnesses for false statements and affidavits; threatening witnesses with arrest, jail, prosecution, civil litigation, and reputational harm; and attempting to cause reputational harm and discredit potential witnesses by disseminating false or embarrassing information.

*Nygard's Victims*

11.   PETER NYGARD, the defendant, and others known and unknown, including employees of the Nygard Group, used fraud, force, and coercion to cause at least dozens of adult and minor-aged female victims to engage in commercial sex by recruiting, enticing, transporting, harboring, and maintaining adult and minor-aged female victims for NYGARD's sexual gratification and, on occasion, the gratification of NYGARD's personal friends and business associates.

12.   PETER NYGARD, the defendant, and others known and unknown, frequently targeted women and minor-aged girls who came from disadvantaged economic backgrounds and/or who had a history

8

of abuse. NYGARD maintained control over his victims through threats, promises to grant or withhold modeling opportunities and other career advancement, granting and withholding of financial support, and by other coercive means, including constant surveillance, restrictions of movement, and physical isolation. NYGARD forcibly sexually assaulted some of his victims. Other victims were forcibly assaulted by NYGARD's associates or drugged to ensure their compliance with NYGARD's sexual demands. Some of NYGARD's victims were minors.

13. To recruit victims, PETER NYGARD, the defendant, and others known and unknown, used a network of trusted associates; "girlfriends"; and Nygard Group employees. Many of the victims were initially invited to dinners or parties at NYGARD's residences, particularly in the Bahamas and in Marina del Rey, California, where NYGARD regularly hosted dinner parties and larger, so-called "Pamper Parties" for female guests. Many victims were initially induced, coerced, and forced to have sex with NYGARD through one or more of the following: false promises of modeling or fashion industry jobs; the supply of alcohol and/or drugs, including the drugging of drinks without the victim's knowledge; and physical force. Following sexual activity, NYGARD typically paid victims with cash that he accessed through the Nygard Group. In some instances, NYGARD intended these payments to secure a victim's silence. In other instances, NYGARD intended these

9

payments to facilitate future sexual activity with the victim induced through force, fraud, and coercion.

14.   PETER NYGARD, the defendant, and others known and unknown, maintained ongoing personal and quasi-professional relationships with certain of NYGARD's victims, whom he referred to as "girlfriends," "assistants," or both.  NYGARD required these "girlfriends" to travel and to stay with him regularly, including in the Southern District of New York; to engage in sexual activity at his direction (including with NYGARD, with each other, and with others); and to recruit new women and minor-aged girls for NYGARD to have sex with.

15.   PETER NYGARD, the defendant, and others known and unknown, maintained control over these "girlfriends" for the purpose of inducing additional acts of commercial sex through a variety of means including force, fraud, and coercion.  For example, NYGARD and his associates provided alcohol and illegal drugs, including cocaine and ecstasy, to "girlfriends" in advance of sexual activity and threatened or berated "girlfriends" if they did not agree to participate.  NYGARD sometimes forcibly assaulted "girlfriends" who did not comply with NYGARD's sexual demands – or caused others to do so at his direction or with his approval. NYGARD dictated the daily activities of "girlfriends" and the details of their appearance, including how "girlfriends" could style their hair and what clothing he would permit them to wear.

10

"Girlfriends" were also under constant surveillance by NYGARD and his associates and were not permitted to leave premises without NYGARD's express permission.

16.   PETER NYGARD, the defendant, and others known and unknown, paid for commercial sex using funds from the Nygard Group. Although victims were often first paid in cash on a transactional basis, once NYGARD elevated a particular victim to the status of "girlfriend," he typically paid her a monthly stipend or allowance rather than per sexual transaction, frequently by putting such "girlfriends" on the payroll of one of the entities within the Nygard Group, as "models," "assistants," or in other positions. Other victims were first employed by the Nygard Group for ostensibly legitimate positions, such as project manager or communications assistant.   NYGARD also provided payments-in-kind to these victims (including plastic surgery, medical procedures, rent, and travel), as well as making additional promises of help with their careers.   However, for these victims, NYGARD made clear that succumbing to his sexual demands was a condition of their continued employment and other benefits.

*Nygard's Means of Recruitment*

17.   "Pamper Parties," dinners, and poker games:

a.    PETER NYGARD, the defendant, and others known and unknown, recruited victims at "Pamper Parties" that NYGARD hosted at his properties in Marina del Rey and the Bahamas.   Women

and girls were often invited to the parties by ComCor employees. They were also sometimes invited by "girlfriends" or "assistants" or by NYGARD's friends or business associates.

b. Nygard Group employees were responsible for: (i) taking photographs and obtaining the contact information of Pamper Party guests to ensure that NYGARD approved of the physical appearance of each guest and to create a record of approved guests for future parties, dinners, poker games, and general recruitment; (ii) uploading this information to a corporate server or document management system, or emailing it directly to NYGARD, for NYGARD's review; and (iii) ensuring that NYGARD had supplies like condoms, lubricant, and cash available.

c. NYGARD, and others known and unknown, also used dinner parties and poker games at NYGARD's Marina del Ray and Bahamas properties as a means of recruitment. Women and girls were invited through similar channels to those used for Pamper Parties, and underwent the same screening procedures as Pamper Party attendees.

d. At the Pamper Parties, dinners, and poker games, NYGARD frequently used a "girlfriend" or another person in his employ to approach a chosen woman or girl to indicate his interest in sexual activity. The "girlfriend" or employee facilitated a sexual encounter by, among other things, encouraging alcohol and recreational drug use and talking favorably of NYGARD

12

and the opportunities he may make available to the victim.  NYGARD then engaged in sexual activity with the victim on the premises and paid her cash, usually between several hundred and several thousand dollars in U.S. currency, after the interaction.  At times, unwilling participants, including minor girls, were drugged to force their compliance with NYGARD's sexual demands.  At other times, victims had no advance warning of NYGARD's interest in sexual activity and were instead lured to a more secluded area of the property where NYGARD used physical force and/or psychological pressure to coerce sex.

18.   Sex and Swingers Club Connections:

a.   PETER NYGARD, the defendant, and others known and unknown, also regularly patronized sex and "swingers" clubs with one or more "girlfriends," including clubs in New York City, Miami, Los Angeles, and Winnipeg.  While at the clubs, NYGARD directed and pressured "girlfriends" through manipulation, intimidation, degradation, threats and on occasion, force, to engage in sex with other men in order to facilitate NYGARD having sex with other women and for his own sexual gratification.  At these clubs, NYGARD frequently forced his victims to engage in group sexual activity to which they had not consented.

b.   NYGARD also engaged in sexual "swaps" with male friends and business associates, who would bring NYGARD a "date" for sex in exchange for access to one of NYGARD's

"girlfriends" for sex. "Girlfriends" were not consulted in advance that they would be traded for sex and NYGARD often pressured them to comply with such swaps at his direction through manipulation, intimidation, degradation, and threats.

19.   "Girlfriend" Connections:

a. PETER NYGARD, the defendant, and others known and unknown, also relied on "girlfriends" and "assistants" to identify new potential victims and facilitate NYGARD's access to them. "Girlfriends" regularly contacted other women, including their personal friends, inviting them to travel with them or to visit one of NYGARD's residences.   Some "girlfriends" also approached women and minor girls in public places like Times Square and Los Angeles shops and invited them back to NYGARD's residence or hotel room.   NYGARD compensated "Girlfriends" and "assistants," for their role in securing new sexual partners for him.

Notice of Special Sentencing Factor

20.   As part of his agreement to conduct and participate in the conduct of the affairs of the Nygard Enterprise through a pattern of racketeering activity, PETER NYGARD, the defendant, and others known and unknown, agreed that multiple acts indictable under Title 18, United States Code, Sections 1591(a), (b)(1), and (b)(2) would be committed, to wit, a conspirator would, in or affecting interstate commerce, recruit, entice, harbor, transport, provide, obtain, advertise, maintain, patronize, and solicit, by

14

any means, persons, and would benefit, financially and by receiving anything of value, from participation in a venture which has engaged in any such act, knowing and in reckless disregard of the fact that (1) means of force, threats of force, fraud, and coercion, and any combination of such means, would be used to cause the persons to engage in commercial sex acts, in violation of Title 18, United States Code, Section 1591(a) and (b)(1); and (2) such persons have not attained the age of 18 years and would be caused to engage in one or more commercial sex acts, in violation of Title 18, United States Code, Sections 1591(a) and (b)(2).

(Title 18, United States Code, Section 1962(d).)

## COUNT TWO
### (Conspiracy to Commit Sex Trafficking)

The Grand Jury further charges:

21.    From in or about 1995, up to and including in or about 2020, in the Southern District of New York and elsewhere, PETER NYGARD, the defendant, and others known and unknown, willfully and knowingly, in and affecting interstate commerce, did combine, conspire, confederate and agree to recruit, entice, harbor, transport, provide, obtain, advertise, maintain, patronize, and solicit, by any means, persons, and to benefit, financially and by receiving anything of value, from participation in a venture which has engaged in any such act, knowing and in reckless disregard of the fact that (1) means of force, threats of

15

force, fraud, and coercion, and any combination of such means, would be used to cause the persons to engage in commercial sex acts, in violation of Title 18, United States Code, Section 1591(a) and (b)(1); and (2) some such persons have not attained the age of 18 years and would be caused to engage in one or more commercial sex acts, in violation of Title 18, United States Code, Sections 1591(a) and (b)(2), to wit, NYGARD, and others known and unknown, agreed to recruit, entice, harbor, transport, provide obtain, advertise, maintain, patronize, and solicit women and minor girls, including Minor Victim-1, Victim-2, and Victim-3, as alleged in Counts Three, Four, and Five respectively, and caused the women and minor girls, including Minor Victim-1, Victim-2, and Victim-3, to engage in commercial sex acts, knowing, and in reckless disregard of the fact that the women and minor girls were engaging in commercial sex acts as a result of force, threats of force, fraud and coercion, and knowing, and in reckless disregard of the fact that the minor girls had not attained the age of 18 years.

(Title 18, United States Code, Section 1594.)

### COUNT THREE
### (Sex Trafficking of a Minor and by Force, Fraud, or Coercion)

The Grand Jury further charges:

22.   In or about 2012, in the Southern District of New York and elsewhere, PETER NYGARD, the defendant, knowingly, in and affecting interstate and foreign commerce, did recruit, entice,

harbor, transport, provide, obtain and maintain, by any means a

person, and did benefit, financially and by receiving anything of

value, from participation in a venture which has engaged in such

acts, knowing and in reckless disregard of the fact that force,

fraud, and coercion, as described in Title 18, United States Code,

Section 1591(e)(2), and any such combination of such means, would

be used to cause the person to engage in a commercial sex act, and

that this person had not attained the age of 18 years and would be

caused to engage in a commercial sex act, and aided and abetted

the same, to wit, NYGARD recruited, enticed, transported, provided

and maintained Minor Victim-1, and caused Minor Victim-1 to engage

in commercial sex acts, knowing, and in reckless disregard of the

fact that Minor Victim-1 was engaging in commercial sex acts as a

result of force, fraud and coercion, and knowing, and in reckless

disregard of the fact that Minor Victm-1 had not attained the age

of 18 years.

> (Title 18, United States Code,
> Sections 1591(a), (b)(1), (b)(2) and (2).)

### COUNT FOUR
### (Sex Trafficking by Force, Fraud, or Coercion)

The Grand Jury further charges:

23.   From at least in or about 2017, up to and including

or about 2018, in the Southern District of New York and elsewhere,

PETER   NYGARD,   the   defendant,   knowingly,   in   and   affecting

interstate   and   foreign   commerce,   did   recruit,   entice,   harbor,

17

transport, provide, obtain, advertise, maintain, patronize, and solicit by any means a person, and did benefit, financially and by receiving anything of value, from participation in a venture which has engaged in such acts, knowing and in reckless disregard of the fact that force, fraud, and coercion, as described in Title 18, United States Code, Section 1591(e)(2), and any such combination of such means, would be used to cause the person to engage in a commercial sex act, and aided and abetted the same, to wit, NYGARD recruited, enticed, transported, provided and maintained Victim-2, and caused Victim-2 to engage in commercial sex acts, knowing, and in reckless disregard of the fact that Victim-2 was engaging in commercial sex acts as result of force, fraud and coercion.

(Title 18, United States Code,
Sections 1591(a), (b)(1), and (2).)

## COUNT FIVE
### (Sex Trafficking by Force, Fraud, or Coercion)

The Grand Jury further charges:

24.    From at least in or about 2018, up to and including or about 2019, in the Southern District of New York and elsewhere, PETER NYGARD, the defendant, knowingly, in and affecting interstate and foreign commerce, did recruit, entice, harbor, transport, provide, obtain advertise, maintain, patronize, and solicit, by any means a person, and did benefit, financially and by receiving anything of value, from participation in a venture which has engaged in such acts, knowing and in reckless disregard

18

of the fact that force, fraud, and coercion, as described in Title 18, United States Code, Section 1591(e)(2), and any such combination of such means, would be used to cause the person to engage in a commercial sex act, and aided and abetted the same, to wit, NYGARD recruited, enticed, transported, provided and maintained Victim-3, and caused Victim-3 to engage in commercial sex acts, knowing, and in reckless disregard of the fact that Victim-3 was engaging in commercial sex acts as result of force, fraud and coercion.

(Title 18, United States Code,
Sections 1591(a), (b)(1), and (2).)

## COUNT SIX
### (Transportation of a Minor for Purpose of Prostitution)

The Grand Jury further charges:

25.   In or about 2012, in the Southern District of New York and elsewhere, PETER NYGARD, the defendant, and others known and unknown, knowingly transported and attempted to transport a minor who was less than 18 years old in interstate and foreign commerce, with intent that the minor engage in prostitution, and aided and abetted the same, to wit, NYGARD, and others known and unknown, arranged to have Minor Victim-1 travel across state and international lines, including to New York, for the purpose of engaging in prostitution.

(Title 18, United States Code, Sections 2423(a) and 2.)

19

## COUNT SEVEN
### (Transportation for Purpose of Prostitution)

The Grand Jury further charges:

26.   From in or about 2017 up to and including in or about 2018, in the Southern District of New York and elsewhere, PETER NYGARD, the defendant, and others known and unknown, knowingly transported and attempted to transport persons in interstate and foreign commerce, with intent that the person engage in prostitution, and aided and abetted the same, to wit, NYGARD, and others known and unknown, arranged to have Victim-2 travel across state and international lines, including to New York, for the purpose of engaging in prostitution.

(Title 18, United States Code, Sections 2421 and 2.)

## COUNT EIGHT
### (Transportation for Purpose of Prostitution)

The Grand Jury further charges:

27.   From in or about 2018 up to and including in or about 2019, in the Southern District of New York and elsewhere, PETER NYGARD, the defendant, and others known and unknown, knowingly transported and attempted to transport persons in interstate and foreign commerce, with intent that the person engage in prostitution, and aided and abetted the same, to wit, NYGARD, and others known and unknown, arranged to have Victim-3 travel across state and international lines, including to New York, for the purpose of engaging in prostitution.

20

(Title 18, United States Code, Sections 2421 and 2.)

## COUNT NINE
### (Transportation for Purpose of Prostitution and Illegal Sexual Activity)

The Grand Jury further charges:

28.   In or about 2010, in the Southern District of New York and elsewhere, PETER NYGARD, the defendant, and others known and unknown, knowingly transported a person in interstate and foreign commerce, with intent that the person engage in prostitution, and with intent to engage in sexual activity for which a person can be charged with a criminal offense, and attempted to do the same, to wit, NYGARD, and others known and unknown, arranged to have Victim-4 travel across state lines, including to New York, for the purpose of engaging in prostitution, and with the intent that NYGARD would engage in one or more sex acts with Vicitm-4, in violation of New York Penal Law Sections 130.52 and 130.55.

(Title 18, United States Code, Sections 2421 and 2.)

### FORFEITURE ALLEGATION AS TO COUNT ONE

29.   As a result of committing the offense alleged in Count One of this Indictment, PETER NYGARD, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 1963, any and all interests the defendant acquired or maintained in violation of Title 18, United States Code, Section

21

1962; any and all interests in, securities of, claims against, and property or contractual rights of any kind affording a source of influence over, the enterprise named and described herein which the defendants established, operated, controlled, conducted, and participated in the conduct of, in violation of Title 18, United States Code, Section 1962; and any and all property constituting and derived from proceeds obtained, directly and indirectly, from racketeering activity in violation of Title 18, United States Code, Section 1962, the offense alleged in Count One of this Indictment, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of the offense alleged in Count One.

## FORFEITURE ALLEGATION AS TO COUNTS TWO THROUGH FIVE

30. As a result of committing the sex trafficking offenses, in violation of Title 18, United States Code, Sections 1591(a), (b)(1), (b)(2), 1594 and 2, alleged in Counts Two through Five of this Indictment, PETER NYGARD, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 1594: (1) any property, real and personal, that was involved in, used or intended to be used to commit or to facilitate the commission of the offenses, and any property traceable to such property; and (2) any property, real and personal, constituting or

22

derived from, any proceeds obtained, directly or indirectly, as a result of the offenses, or any property traceable to such property.

## Substitute Assets Provision

31. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third person;

c. has been placed beyond the jurisdiction of the Court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be subdivided without difficulty,

it is the intent of the United States, pursuant to Title 18, United States Code, Section 1963(m) and Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the above forfeitable property.

(Title 18, United States Code, Sections 1594 and 1963;
Title 21, United States Codes, Section 853; and
Title 28, United States Code, Section 2461.)

FOREPERSON

AUDREY STRAUSS
Acting United States Attorney

23

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

PETER NYGARD,

Defendant.

## SEALED INDICTMENT

20 Cr. ___ (__)

(18 U.S.C. §§ 1591, 1594, 1962, 2421,
2423, and 2.)

AUDREY STRAUSS
Acting United States Attorney.

### A TRUE BILL

Foreperson.