**GOMEZ TRIAL ATTORNEYS**
JOHN H. GOMEZ (171485)
*jgomez@thegomezfirm.com*
DEBORAH S. DIXON (248965)
*ddixon@thegomezfirm.com*
655 W. Broadway Suite 1700
San Diego, California 92101
Telephone: (619) 237-3490
Facsimile: (619) 237-3496

**THE HABA LAW FIRM, P.A.**
LISA D. HABA (*pro hac vice*)
*lisahaba@habalaw.com*
1220 Commerce Park Dr., Ste. 207
Longwood, Florida 32779
Telephone: (844) 422-2529

**DICELLO LEVITT GUTZLER LLC**
GREG G. GUTZLER (*pro hac vice*)
*ggutzler@dicellolevitt.com*
F. FRANKLIN A. AMANAT (*pro hac vice*)
*famanat@dicellolevitt.com*
One Grand Central Place
60 E. 42nd Street, Suite 2400
New York, New York 10165
Telephone: (646) 933-1000

***Counsel for Plaintiffs***
*Additional Counsel Listed on Signature Page*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| JANE DOE NOS. 1-10,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>DANIEL S. FITZGERALD,<br><br>　　　　Defendant. | Case No: 2:20-cv-10713-MWF-RAO<br><br>**FOURTH AMENDED COMPLAINT** |

## **INTRODUCTION**

1.      Defendant Daniel S. Fitzgerald, a/k/a "Hollywood Homes," is a sex trafficker who, when faced with the allegations against him, engaged in a swatch of intimidation and harassment tactics in order to conceal his wrongdoing, and to silence victims and witnesses.

2.      After Plaintiffs filed this lawsuit, Defendant and his co-conspirators launched a propaganda campaign of intimidation, lies, and attacks, which is a stereotypical reaction of sex traffickers. This tactic is referred to as "DARVO," which stands for "Deny, Attack, and Reverse Victim and Offender." DARVO is "a reaction perpetrators of wrongdoing, particularly sexual offenders, may display in response to being held accountable for their behavior."[1]

3.      While Defendant was a conspirator in Peter Nygard's internal sex trafficking enterprise, described below, Defendant also formed his own sex trafficking venture.

4.      Plaintiffs here are victims of Defendant through his conspiracy with Nygard (Jane Doe Nos. 1-4 and 7-9), as well as Defendant's own sex trafficking venture (Jane Doe Nos. 5, 6, and 10).

### *Defendant is a Co-Conspirator in the Nygard Sex Trafficking Venture.*

5.      Peter Nygard ("Nygard") is in jail after being charged with multiple counts of sex trafficking and racketeering in the United States, and multiple counts of sexual assault and forcible confinement in Canada.

---

[1] "The perpetrator or offender may Deny the behavior, Attack the individual doing the confronting, and Reverse the roles of Victim and Offender such that the perpetrator assumes the victim role and turns the true victim -- or the whistle blower -- into an alleged offender. This occurs, for instance, when an actually guilty perpetrator assumes the role of 'falsely accused' and attacks the accuser's credibility and blames the accuser of being the perpetrator of a false accusation." *See* https://dynamic.uoregon.edu/jjf/defineDARVO.html (last accessed December 6, 2021).

6.    On December 15, 2020, the Department of Justice ("DOJ") indicted Nygard for a decades-long racketeering enterprise and sex trafficking venture ("Nygard-Defendant Sex Trafficking Venture"), in which co-conspirators, such as Defendant, participated in and enabled. *See United States v. Nygard*, No. 20 CR 624 (S.D.N.Y.) ("DOJ Indictment") (annexed as Exhibit 1).

7.    As the DOJ determined, the purpose of the Nygard-Defendant Sex Trafficking Venture was to "recruit, entice, transport, harbor, and maintain adult and minor-aged female victims for Nygard's sexual gratification," including through the use of "force, fraud, and coercion to cause women to engage in commercial sex with Nygard ***and others***." *See* Ex. 1 at ¶ 3 (emphasis added). Defendant was one of the "others" that participated in the coerced sexual acts, including with several Plaintiffs in this case.

8.    Nygard and his associates, including Defendant, "used fraud, force and coercion to cause at least dozens of adult and minor-aged female victims to engage in commercial sex by recruiting, enticing, transporting, harboring, and maintaining adult and minor-aged female victims for Nygard's sexual gratification and, on occasion, the gratification of ***Nygard's personal friends*** and business associates." Ex. 1, ¶ 11 (emphasis added). Defendant was one of Nygard's "personal friends" who engaged in the coerced commercial sex acts with adult and minor-aged female victims.

9.    Defendant profited from his participation in the Nygard Sex Trafficking Venture, including access to parties, travel on Nygard's private jet to exotic locations, free accommodations, and access to captive young women or girls for his lascivious sexual gratification, including having Nygard watch as Defendant had sex with a Nygard "girlfriend" and Defendant would watch Nygard have sex with Defendant's "girlfriend."

10.   Defendant participated in "sexual swaps" with Nygard. This activity was recounted in the DOJ Indictment: "Nygard would engage in "sexual 'swaps'

1   with male friends and business associates, who would bring Nygard a 'date' for sex
2   in exchange for access to one of Nygard's 'girlfriends' for sex. 'Girlfriends' were
3   not consulted in advance that they would be traded for sex and Nygard often
4   pressured them to comply with such swaps at his direction through manipulation,
5   intimidation, degradation, and threats." Ex. 1, ¶18(b) (emphasis added).

6       11.   On information and belief, Defendant was one of the "male friends"
7   referred to in the DOJ Indictment.

8       12.   Jane Doe Nos. 1-4 and 7-9 are survivors of the "sexual swap"
9   trafficking scheme exploited by Defendant and Nygard.

10      13.   And, apropos of the "sex swaps," Nygard stated that Defendant has
11  "shared literally everything of mine." As seven (7) of the Plaintiffs here can attest,
12  they were "shared" by Nygard, as part of a coerced sex swap with Defendant, who
13  would, in turn, "share" his girlfriends or female companions with Nygard.

14      14.   As a member of the Nygard-Defendant Sex Trafficking Venture,
15  Defendant knowingly participated in, and benefited from, the venture by engaging
16  in commercial sex acts with young women or girls who he knew were being sex
17  trafficked by Nygard and the web of companies he owns and controls ("Nygard
18  Companies").

19      15.   Defendant was flown in Nygard's private jet to exotic resorts and
20  destinations, surrounded by vastly younger women, and entertainment and prestige
21  for Defendant's attempted social media presence and self-glorification.

22      16.   Further, as Defendant admitted when discussing Nygard in 2021: "I'll
23  help my friend out, ok. I'll testify for him. That's what friends do. He's taken me
24  around the world in his jet. He's been my friend, he's invited me to parties, I've
25  played poker at his house for 30 years, ok."

26

27

28

*Defendant Also Formed His Own Sex Trafficking Venture, Modeled After Nygard.*

17.   Defendant also had his own sex trafficking venture, modeled after the Nygard venture.

18.   Defendant harbored and maintained multiple young women at the same time for the purpose of coercing commercial sex acts.

19.   Jane Doe Nos. 5, 6, 10 were victims of Defendant's sex trafficking venture. This is a civil action for damages under the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595 ("TVPRA"), and state law, brought by Plaintiffs Jane Doe Nos. 1-10, arising from (i) Defendant's participation in the Nygard-Defendant Sex Trafficking Venture; (ii) Defendant's own sex trafficking venture; and (iii) his subsequent harassment, intimidation, and defamation of Plaintiffs.

## **PARTIES**

### A.   **Plaintiff Jane Doe Nos. 1-10**

20.   Jane Doe No. 1 is a United States citizen who resides in the United States.

21.   Jane Doe No. 2 is a United States resident who resides in the United States.

22.   Jane Doe No. 3 is a United States citizen who resides in the United States.

23.   Jane Doe No. 4 is a United States citizen who resides in the United States.

24.   Jane Doe No. 5 is a United States resident who resides in the United States.

25.   Jane Doe No. 6 is a United States resident who resides in the United States.

*Jane Doe Nos. 1-10 v. Daniel S. Fitzgerald*, Case No. 2:20-cv-10713-MWF-RAO
FOURTH AMENDED COMPLAINT

26.     Jane Doe No. 7 is a United States resident who resides in the United States.

27.     Jane Doe No. 8 is a United States resident who resides in the United States.  At all relevant times to this Fourth Amended Complaint, Jane Doe No. 8 was under the age of eighteen.

28.     Jane Doe No. 9 is a United States citizen who resides in the United States.

29.     Jane Doe No. 10 is a United States citizen who resides in the United States.

30.     Plaintiffs are using pseudonyms because of the highly personal nature of their victimization and because of the serious risk of harm to which they would be exposed if they brought this suit in their actual names.

31.     Plaintiffs are at serious risk of retaliatory harm from filing this lawsuit because Defendant has committed acts of violence against one or more of the Plaintiffs when they have acted against his wishes.

32.     As shown in previous filings before this Court, Defendant participated in creating several videos, posted on YouTube, and multiple Instagram profiles that identify various Jane Does as being Plaintiffs in this case, using private videos and images, and wrongfully accusing Plaintiffs and Plaintiffs' counsel of being, among other things, criminals.

33.     This was all done in an overt effort to obstruct enforcement of Plaintiffs' criminal and civil rights under the TVPRA, and to deter other victims and witnesses from coming forward.

34.     Defendant has also approached the mother and sister of one of Plaintiffs and slandered the Jane Doe to Jane Doe's mother.

35.     Defendant's intimidation tactics also involve violence. For example, Defendant's violent temper surfaced when Jane Doe No. 4 attempted to leave a Defendant property, and Defendant attacked her and attempted to suffocate her.

36.     Defendant's efforts to prevent discovery of the truth in this case goes beyond his conspiracy with Nygard to disseminate the defamatory propaganda. It extends into 2021 when Defendant paid someone to steal Jane Doe No. 5's car so the evidence on her phone and other materials in the car could be destroyed.

37.     Defendant's propensity for violence was further displayed when he dislocated Jane Doe No. 5's shoulder, tore her labrum, and caused severe physical injury to her back and breasts while attacking her.

38.     Further, Defendant has already articulated – and in fact manifested – his intent to publicly humiliate and shame Plaintiffs by claiming that Plaintiffs are simply seeking a "payday," attempting to besmirch the impact of their trauma and further marginalize and denigrate them for shining the light of truth on Defendant's conduct.

39.     As noted above, Defendant engineered videos and social media posts that identify Plaintiffs with the intent of intimidating, humiliating, and silencing Plaintiffs, other victims, and witnesses.

40.     Defendant has contacted victims of his sex trafficking ventures to influence, intimidate, coerce, and defraud them into remaining silent and to keep them from coming forward with their truth.

41.     Defendant also falsely accuses Plaintiffs of being bribed to concoct wholesale lies about their sexual abuse.

42.     Defendant and his co-conspirators have tremendous wealth and power and have used it to retaliate against others who have attempted to come forward.

43.     Plaintiffs are also vulnerable because of Defendant and his co-conspirators' corruption of law enforcement through bribery and political influence.[2]

---

[2] *See, e.g.*, *Nygard 'Outright Bribery' Of PLP*, The Tribune, (Feb. 13, 2018), http://www.tribune242.com/news/2018/feb/14/nygard-outright-bribery-plp/; *Nygard Gave Money To PLP - Then Asked For Help Over Land Issues*, The Tribune, (June 24, 2014), http://www.tribune242.com/news/2014/jun/25/nygard-gave-money-plp-then-asked-help-over-land-is/. *Fresh Questions Over Las Vegas Trip For Pm, Gibson And Nygard Meeting*, The Tribune,

44.     Because Defendant's victimization of Plaintiffs is part of multiple sex trafficking conspiracies, Plaintiffs reasonably fear retaliation from Defendant his co-conspirators.

45.     Plaintiffs' safety, right to privacy, and personal security outweigh the public interest in their identification.

46.     Plaintiffs knew that Defendant uses his power, wealth, and influence to control those around him.

47.     Plaintiffs allege that Defendant has taken violent or destructive action against Plaintiffs and Plaintiffs' witnesses.

48.     It is in the public's interest to give anonymity to rape and sex trafficking survivors so that other victims will feel the ability to come forward and not be fearful that their identity will be publicized.

49.     Plaintiffs' legitimate concerns for privacy outweigh any prejudice to Defendant or the public by allowing Jane Does Nos. 1-10 to proceed anonymously.

**B.     Defendant**

50.     Defendant Daniel S. Fitzgerald is a California citizen who resides in California and owns properties in California, as well as a real estate development company that conducts substantial business in California.[3]

51.     Defendant conspired with, and engaged in, an enterprise with numerous third parties located both in and outside the State of California, including, but not limited to, Nygard, the Nygard Companies, myriad Nygard Companies' employees, and other unidentified co-conspirators and enterprise associates.

---

(May 5, 2017), http://www.tribune242.com/news/2017/may/05/fresh-questions-over-las-vegas-trip-pm-gibson-and-/.

[3] Danny Fitzgerald, Con Tec Development, https://www.dannyDefendant.com/aboutcontec (last visited January 20, 2022).

*Jane Doe Nos. 1-10 v. Daniel S. Fitzgerald*, Case No. 2:20-cv-10713-MWF-RAO
FOURTH AMENDED COMPLAINT

# JURISDICTION AND VENUE

52.     This Court has federal question subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, because Plaintiffs bring this action under the federal TVPRA statute, 18 U.S.C. § 1595.

53.     Plaintiffs Jane Doe Nos. 1-10's claims arise out of the same series of transactions or occurrences and share common questions of law or fact. The essential facts underlying Jane Doe Nos. 1-10's claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in a single lawsuit. There is also substantial overlap in questions of law or fact across Jane Doe Nos. 1-10's claims.

54.     This Court also has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein are part of the same nucleus of operative facts.

55.     This Court has personal jurisdiction over Defendant because he is a resident of this State. Further, the events giving rise to the causes of action asserted herein substantially occurred in California, insofar as Defendant knowingly conspired, aided and abetted, facilitated, and directly participated in the Nygard-Defendant Sex Trafficking Venture through actions that occurred in this State. Defendant also knowingly conspired, aided and abetted, facilitated and directly participated in his own sex trafficking venture through actions that occurred in the state of California.

56.     Venue is proper in this District, under 28 U.S.C. § 1391(b)(2) because Defendant knowingly engaged in sex trafficking in this District and, therefore, a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

# LEGAL BACKGROUND

## I.  THE TVPRA

57.    The federal sex trafficking statute, 18 U.S.C. § 1591, outlaws sex trafficking activities that affect interstate or foreign commerce or take place within the territorial jurisdiction of the United States. It is to be construed expansively because it serves a remedial purpose and uses intentionally broad language.

58.    The federal sex trafficking statute, 18 U.S.C. § 1591(a), criminalizes any person acting in interstate or foreign commerce, or within the territorial or maritime jurisdiction of the United States, who knowingly:

> (1) … recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or

> (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),

> knowing, or … in reckless disregard of the fact, that means of force, threats of force, fraud, coercion …, or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act ….

59.    18 U.S.C. § 1591(d) criminalizes "obstructing, attempting to obstruct, or in any way interfering with or preventing the enforcement of this section."

60.    The TVPRA, 18 U.S.C. § 1595, provides a civil remedy to victims of sex trafficking crimes, including violations of 18 U.S.C. § 1591(a) and § 1591(d), against the perpetrator of such crimes and against anyone else who knowingly benefits, financially or by receiving anything of value, from participation in a venture which that person knew or should have known has engaged in a sex trafficking crime. 18 U.S.C. §1595(a).

# FACTUAL ALLEGATIONS

## I.    Defendant Engaged in Coerced Commercial Sex Acts with Jane Doe Nos. 1-10.

61.     Defendant knowingly participated in the Nygard-Defendant Sex Trafficking Venture by engaging in commercial sex acts with Jane Doe Nos. 1-4, 7-9.

62.     Defendant regularly participated in Nygard's Sex Trafficking Venture.

63.     Defendant knew that Nygard's "girlfriends" were forced and/or coerced sex workers that were being instructed by Nygard to engage in sex swaps for their own sexual gratification based on the power and intrigue of forcing women to have sex with their friends.

64.     Nygard would order one of his forced and/or coerced "girlfriends" to have sex with Defendant, often so that Nygard could carefully watch the forced sex act, and Nygard would receive a female from Defendant in exchange. Defendant would watch Nygard engaged in sexual acts with Defendant's "shared" female. Nygard and Defendant treated sex with young women and girls as a currency.

65.     When Nygard was in Los Angeles, Defendant was frequently at his house for a sex swap or sexual encounter.

66.     Defendant modeled Nygard's various methods of force and coercion to compel women to obey his commands so he could manipulate and abuse them.

67.     Defendant also built his own sex trafficking network and scheme, modeled after the Nygard scheme.

68.     Defendant is a long-time friend and associate of Nygard's who frequently attended "pamper parties"[4] and dinners (events used by Nygard to lure

_____

[4] Danny Fitzgerald (@dannyhollywoodhomes), INSTAGRAM, https://www.instagram.com/p/BehBmpwDZW-/ (last visited 1/21/2022); Danny Fitzgerald (@dannyhollywoodhomes), INSTAGRAM, https://www.instagram.com/p/BjmAvU2A86k/ (last visited Jan. 21, 2022); Danny Fitzgerald (@dannyhollywoodhomes), INSTAGRAM, https://www.instagram.com/p/BrMcKpBn28C/ (last visited Jan. 21, 2022); Danny Fitzgerald (@dannyhollywoodhomes), INSTAGRAM, https://www.instagram.com/p/B3TwcWWAP2K/ (last visited Jan. 21, 2022); Danny Fitzgerald (@dannyhollywoodhomes), INSTAGRAM, https://www.instagram.com/p/B4I2E_OgQai/ (last visited Jan. 21, 2022).

*Jane Doe Nos. 1-10 v. Daniel S. Fitzgerald*, Case No. 2:20-CV-10713-MWF-RAO
FOURTH AMENDED COMPLAINT

and traffic his victims) at Nygard's Marina Del Rey property and other locations around the world.

69.     "To recruit victims, Peter Nygard, the defendant, and others known and unknown, used a ***network of trusted associates***, 'girlfriends,' and Nygard Group employees. Many of the victims were initially invited to dinners or parties at Nygard's residences, particularly in the Bahamas and in Marina del Rey, California.… Many victims were initially induced, coerced, and forced to have sex with Nygard through one or more of the following: false promises of modeling or fashion industry jobs; the supply of alcohol and/or drugs, including the drugging of drinks without the victim's knowledge; and physical force." Ex. 1, ¶ 13 (emphasis added). The referenced "network of trusted associates" includes Defendant, with whom Nygard frequently "swapped" and attempted to "swap" sex trafficking victims, including Jane Doe Nos. 1-4, 7-9.

70.     Defendant was one of Nygard's closest friends and, according to Nygard, he and Defendant "shared literally everything."

71.     Defendant was Nygard's companion at the pamper parties and dinners where Nygard exercised complete control over young women whose passports had been confiscated and had no money or lodging.

72.     At those parties and dinners, Nygard would instruct his young girlfriends to engage in sex acts with Defendant.

73.     Defendant knew that without Nygard's instruction, the "girlfriends" were controlled and forbidden from doing any such thing.

74.     Defendant knew that Nygard's "girlfriends" were being forced and/or coerced to engage in sex acts with Defendant.  One example of his knowledge was the Defendant would thank Nygard after engaging in sex acts with the victims.

75.     Defendant and Nygard exchanged value amongst themselves in return for their sexual swap.

76.     Defendant provided women to Nygard so that he could attend Nygard's lavish parties, dinner, play poker at Nygard's parties, and fly around the world on Nygard's private jet.

77.     Defendant received value for the coerced sex swaps in the form of riding off Nygard's wealth, fame, notoriety, social status, financial benefits, and sexual appetite.

78.     Defendant openly promotes the Nygard image in order to recruit, lure, and entice young women to attend the "pamper parties," dinners and events at Nygard's properties.

79.     Defendant posts his various misogynistic ventures on his social media to attract new viewers and elevate his "status" for a larger platform to perpetuate his sex trafficking scheme.





(Nygard is on the left; Defendant's hand is entering from the right).

80.     While participating in, Nygard's sex trafficking venture, Defendant started employing Nygard's tactics to develop his own sex trafficking venture; to wit, Defendant would promise young women lodging and career opportunities if they lived with him or stood by his side.  But what the women weren't told is that they would be coerced into sex acts with Defendant and others close to him.

81.     Based on his decades of friendship with Nygard and his attendance at events with Nygard, Defendant knows of the Nygard Sex Trafficking Venture and was one of Nygard's most trusted associates.

82.     When Nygard was in Marina del Rey, as noted above and described more fully below, Defendant would routinely be at Nygard's house, engaging in numerous commercial sex acts as part of the Nygard Sex Trafficking Venture.

83.     Defendant is even listed on Nygard Companies' employee contact lists as an employee at the Marina del Rey compound.

84.     Defendant has frequently traveled on the Nygard Companies' corporate jet ("N-Force") to locations in South America, the Caribbean, and New York for the purpose of furthering and participating in the Nygard Sex Trafficking Venture.

85.    Defendant also knowingly recruits, lures, and entices young women to engage in commercial sex acts with himself and Nygard, flying them from, among other places, locations in Las Vegas, Nevada and San Jose, California.[5]

86.    Nygard frequently traveled to California and stayed at his Marina del Rey property. On most such occasions, Defendant would come to the Marina del Rey house for dinner, poker, and forced and/or coerced commercial sex acts with one of Nygard's "girlfriends" or other women under Nygard's control.

87.    As stated above, the DOJ Indictment noted that personal friends and associates of Nygard would "swap" women with Nygard; Defendant was the most notable of those friends who, in exchange for sex acts, would bring a female with him to "offer" to Nygard.

88.    In exchange for Defendant's knowing recruitment for, participation in, and conspiracy in Nygard's Sex Trafficking Venture, Nygard forced and/or coerced his "girlfriends" and/or women under his control to perform commercial sex acts with Defendant.

89.    Defendant also uses his association with Nygard and the Nygard enterprise, and his attendance at "pamper parties," dinners and poker to benefit and promote himself and his business on social media, and to further the goals of the Nygard enterprise.[6]

---

[5] *See* Danny Fitzgerald (@dannyhollywoodhomes), INSTAGRAM, https://www.instagram.com/p/B4I2E_OgQai/ (last visited Jan. 21, 2022).

[6] *See* Danny Fitzgerald (@dannyhollywoodhomes), INSTAGRAM, https://www.instagram.com/p/BehBmpwDZW-/ (last visited Jan. 21, 2022); Danny Fitzgerald (@dannyhollywoodhomes), INSTAGRAM, https://www.instagram.com/p/BjmAvU2A86k/ (last visited Jan. 21, 2022; Danny Fitzgerald (@dannyhollywoodhomes), INSTAGRAM, https://www.instagram.com/p/BrMcKpBn28C/ (last visited Jan. 21, 2022); Danny Fitzgerald (@dannyhollywoodhomes), INSTAGRAM, https://www.instagram.com/p/B3TwcWWAP2K/ (last visited Jan. 21, 2022); Danny Fitzgerald (@dannyhollywoodhomes), INSTAGRAM, https://www.instagram.com/p/B4I2E_OgQai/ (last visited Jan 21, 2022).

90.     Defendant portrays himself as a playboy, entrepreneur, and partier who rents luxurious homes in Hollywood to celebrities and "influencers" for them to throw parties.[7] In doing so, he also promotes the purpose of the Nygard enterprise, which is to lure and recruit additional sex trafficking victims to engage in commercial sex acts with himself, Nygard, and other associates.

91.     Defendant also viewed himself in the same manner that Nygard did and attempted to gather a group of women around himself that he could have at his "beck and call" for sexual service.  Defendant copied the Nygard model, called the women his "girlfriends," had the girlfriends live at his residence, provided these women something of value (housing, payment, etc.) in exchange for sexual acts, and brought them to Nygard's house for a "swap" or an attempted "swap" of the women with Nygard.

**Jane Doe No. 1**

92.     Jane Doe No. 1 was trafficked when Defendant engaged as an active participant in Nygard's sex trafficking venture and participated in a "sex swap" with Jane Doe No. 1 and another female.

93.     Jane Doe No. 1 was an employee of the Nygard Companies, and sex trafficking victim of Nygard and the Nygard Companies.

94.     Nygard exploited his financial, physical, and psychological control over Jane Doe No. 1, which Defendant knew about, to force her to engage in sex acts with Defendant as part of a "swap."

95.     Defendant participated in and benefited from the Nygard-Defendant Sex Trafficking venture.

96.     At a party at Nygard's Marina del Rey property, she met Defendant and his female companion.

---

[7] *See* Danny Fitzgerald, Con Tec Development, https://www.dannyDefendant.com/aboutcontec (last visited January 20, 2022); Danny Fitzgerald, *The Media Loves to Talk About Us*, Con Tec Development https://www.dannyfitzgerald.com/media.

*Jane Doe Nos. 1-10 v. Daniel S. Fitzgerald*, Case No. 2:20-cv-10713-MWF-RAO
FOURTH AMENDED COMPLAINT

97.   At this party, Nygard told Defendant that Jane Doe No. 1 was "a good one," referring to engaging in sex acts with Jane Doe No. 1.

98.   As a result, Defendant expressed interest in engaging in sex acts with Jane Doe No. 1.

99.   Nygard directed Jane Doe No. 1 to engage in sex acts with Defendant against her will.

100.   Defendant then sexually assaulted Jane Doe No. 1, at Nygard's direction.

101.   Defendant then escorted Jane Doe No. 1 to a bedroom and engaged in more sex acts, at Nygard's direction and against her will.

102.   At the same time Nygard had sexual intercourse with the other female provided to him in a "swap" by Defendant.

103.   Both the Defendant and Nygard traded in sex and used sex with young women and girls, such as Jane Doe No. 1, as their "currency."

104.   Defendant and Nygard each received sexual gratification with a young woman in exchange for these sexual acts.

105.   Jane Doe No. 1 received something of value in exchange for the sex acts. Namely, she was compensated financially, maintained employment, and avoided Nygard's wrath by complying with his demands.

106.   At the conclusion of the "sex swap," Fitzgerald thanked Nygard for providing Jane Doe No. 1 to him.

107.   Consequently, Jane Doe No. 1 has been physically, psychologically, financially, and/or reputationally harmed by Defendant.

**B.**   **Jane Doe No. 2**

108.   Jane Doe No. 2 was trafficked when Defendant engaged as an active participant in Nygard's sex trafficking venture and participated in a "sex swap" with Jane Doe No. 2 and another female.

109.   Jane Doe No. 2 was an employee of the Nygard Companies, and sex trafficking victim of Nygard and the Nygard Companies.

110.   Nygard exploited his financial, physical, and psychological control over Jane Doe No. 2, which Defendant knew about, to force her to engage in sex acts with Defendant.

111.   Defendant participated in and benefited from the Nygard-Defendant Sex Trafficking venture.

112.   Jane Doe No. 2 was lured into a bedroom at Nygard's Marina del Rey Property, where she met Defendant and his female companion.

113.   Nygard partially undressed Jane Doe No. 2 and directed Jane Doe No. 2 to engage in sex acts with Defendant against her will.

114.   Defendant engaged in sex acts with Jane Doe No. 2 at Nygard's direction and against her will while Nygard engaged in sexual acts with the other female provided to him by Defendant.

115.   Both the Defendant and Nygard traded in sex and used sex with young women and girls, such as Jane Doe No. 2, as their "currency."

116.   Defendant and Nygard each received sexual gratification in exchange for these sexual acts.

117.   Jane Doe No. 2 received something of value in exchange for the sex acts.   Namely, she was compensated financially, maintained employment, and avoided Nygard's wrath by complying with his demands.

118.   On November 9, 2021, Defendant, or someone acting at the direction of and/or in coordination with Defendant, posted a video to YouTube for public viewing, which identifies Jane Doe No. 2 by name and photograph and falsely accuses her of lying, sexual misconduct, and committing serious criminal activity, among other falsehoods.

119.   Consequently, Jane Doe No. 2 has been physically, psychologically, financially, and/or reputationally harmed by Defendant.

## C.   <u>Jane Doe No. 3</u>

120.   Jane Doe No. 3 was trafficked when Defendant engaged as an active participant in Nygard's sex trafficking venture and participated in a "sex swap" with Jane Doe No. 3 and another female.

121.   Jane Doe No. 3 was an employee of the Nygard Companies, and sex trafficking victim of Nygard and the Nygard Companies.

122.   Nygard exploited his financial, physical, and psychological control over Jane Doe No. 3, which Defendant knew about, to force her to engage in sex acts with Defendant.

123.   Defendant participated in and benefited from the Nygard-Defendant Sex Trafficking venture.

124.   At a dinner party at Nygard's Marina del Rey Property, she met Defendant and his female companion.

125.   Nygard directed Jane Doe No. 3 to engage in sex acts with Defendant against her will.

126.   Defendant engaged in sex acts with Jane Doe No. 3 at Nygard's direction and against her will while Nygard engaged in sexual acts with the other female provided to him by Defendant.

127.   This occurred on more than one occasion.

128.   Both the Defendant and Nygard traded in sex and used sex with young women and girls, such as Jane Doe No. 3, as their "currency."

129.   Defendant and Nygard each received sexual gratification with a young woman in exchange for these sexual acts.

130.   Jane Doe No. 3 received something of value in exchange for the sex acts.   Namely, she was compensated financially, maintained employment, and avoided Nygard's wrath by complying with his demands.

131.   Consequently, Jane Doe No. 3 has been physically, psychologically, financially, and/or reputationally harmed by Defendant.

**D.**    <u>Jane Doe No. 4</u>

132.   Jane Doe No. 4 was trafficked when Defendant engaged as an active participant in Nygard's sex trafficking venture and participated in a "sex swap" with Jane Doe No. 4 and another female. She also was forced and coerced to engage in commercial sexual acts with Defendant while living under his roof.

133.   Jane Doe No. 4 met Nygard, and he invited her to live at his Marina del Rey property.

134.   While living at Nygard's property, Jane Doe No. 4 was repeatedly required to indulge Nygard's sexual appetites against her will.

135.   On multiple occasions while Jane Doe No. 4 was living there, Defendant came to Nygard's house with a female companion.

136.   Nygard exploited his financial, physical, and psychological control over Jane Doe No. 4, which Defendant knew about, to force her to engage in sex acts with Defendant.

137.   Defendant participated in and benefited from the Nygard-Defendant Sex Trafficking venture.

138.   Defendant engaged in sex acts with Jane Doe No. 4 at Nygard's direction and against her will while Nygard engaged in sexual acts with the other female provided to him by Defendant.

139.   This occurred on more than one occasion.

140.   Both the Defendant and Nygard traded in sex and used sex with young women and girls, such as Jane Doe No. 4, as their "currency."

141.   Defendant and Nygard each received sexual gratification with a young woman in exchange for these sexual acts.

142.   Jane Doe No. 4 received something of value in exchange for the sex acts. Namely, she was compensated financially, maintained employment, had a place to live, and avoided Nygard's wrath by complying with his demands.

143.    After a few months, Nygard notified Jane Doe No. 4 that she would no longer be allowed to stay at his house; Nygard suggested she contact Defendant for a place to live.

144.    Having no options and no money, Jane Doe No. 4 moved into Defendant's house.  No expectations were communicated at this time.

145.    Shortly thereafter, Defendant informed Jane Doe No. 4 that she was expected to engage in "threesomes" with Defendant and his girlfriend.

146.    Jane Doe No. 4 repeatedly attempted to avoid sexual contact with Defendant.

147.    On one or more occasions, Jane Doe No. 4 was sleeping and woke up to find Defendant on top of her, raping her.  Jane Doe No. 4 did not consent to this sexual act and on each occasion had her door locked prior to falling asleep.

148.    Defendant received sexual gratification in exchange for these sexual acts with Jane Doe No. 4.

149.    Jane Doe No. 4 received a place to stay in exchange for the sex acts with Defendant.

150.    After enduring this treatment several times, Jane Doe No. 4 decided to leave and told Defendant of her intent to do so.

151.    In response, Defendant became enraged, calling Jane Doe No. 4 profane and racist epithets before violently holding her down and attempting to suffocate her. Jane Doe No. 4 was not able to breathe or get up during Defendant's attack.

152.    Jane Doe No. 4 was in fear of Defendant and what would happen if she left the property and continued to acquiesce to Defendant's sexual demands out of fear of additional physical harm.

153.    When Jane Doe No. 4 finally did escape, she did so in the dead of night, so as to avoid detection by, and physical harm from, Defendant.

154.    On July 9, 2021, Defendant, or someone acting at the direction of and/or in coordination with Defendant, posted a video to YouTube for public viewing,

which identifies Jane Doe No. 4 by name and photograph and falsely accuses her of lying, sexual misconduct, and committing serious criminal activity, among other falsehoods.[8]   Before it was removed, this video was viewed over 1,560 times and has over twenty comments.

155.   It is unknown how many more times it has been distributed and viewed.

156.   On October 6 and 7, 2021, Defendant, or someone acting at the direction of and/or in coordination with Defendant, posted two more videos to YouTube for public viewing, which identifies Jane Doe No. 4 by name and photograph and falsely accuses her of lying, sexual misconduct, and committing serious criminal activity, among other falsehoods.

157.   On November 9, 2021, Defendant, or someone acting at the direction of and/or in coordination with Defendant, posted a video to YouTube for public viewing, which identifies Jane Doe No. 4 by photograph and falsely accuses her of lying, sexual misconduct, and committing serious criminal activity, among other falsehoods.  The video attempts to blur her face but does not do so in all captures.

158.   Consequently, Jane Doe No. 4 has been physically, psychologically, financially, and/or reputationally harmed by Defendant.

**E.   <u>Jane Doe No. 5</u>**

159.   Jane Doe No. 5 was trafficked when Defendant groomed, recruited, solicited, and lured her to travel from the United States to Mexico wherein she also was forced and coerced to engage in commercial sexual acts with Defendant.

***Grooming Prior to Mexico Trip***

160.   Jane Doe No. 5 ran into Defendant on a trip where Defendant encouraged her to stay at his residence under the ruse of offering her a job working an event that offered a financial payment, networking opportunities with important

---

[8] Plaintiffs omit the URL of this YouTube video from this Complaint so as to not perpetuate the defamatory statements and exacerbate the harm it has caused them.

people, free "swag," and recreational opportunities.  Defendant did not request or require rent be paid.

161.  The place where Defendant was staying was remotely located so that it was too far for Jane Doe No. 5 to try to leave.

162.  Once Jane Doe No. 5 was in the home, Defendant began to groom her. He engaged in open sexual acts in front of her with other women and made multiple lewd comments and sexual propositions to her.

163.  After being turned down numerous times, Defendant demanded that Jane Doe No. 5 pay for gas and lift tickets for everyone because "all [his] girls pay in some way or another."  Jane Doe No. 5 understood this to mean that she had to pay financially since she didn't pay for her stay at the house with sexual acts.

### Grooming Involving Peter Nygard

164.  Defendant brought Jane Doe No. 5 to the house of Defendant's friend, Peter Nygard.

165.  While playing poker, Defendant told the men, including Peter Nygard, that "whoever wins can have [Jane Doe No. 5] for the night."

### Trafficking in Mexico

166.  At a later point in time, Defendant lured, enticed, recruited and solicited Jane Doe No. 5 to travel from California to Cabo San Lucas, Mexico with the intent to engage in commercial sex acts with her.  In order to do this, Defendant offered Jane Doe No. 5 lucrative career opportunities and offered to discuss these opportunities with her in Cabo.

167.  Believing the purpose of the trip was to discuss these career opportunities, Jane Doe No. 5 traveled to Cabo and made arrangements to stay in her own room.

168.  On the day of the incident, Jane Doe No. 5 and Defendant went surfing and after, went to the grocery store together in Defendant's vehicle.

169.   Defendant suggested they go to the public jacuzzi at his resort after a long day of surfing, and he indicated they would discuss business at the same time.

170.   Relying on that, Jane Doe No. 5 left her groceries and surf gear in Defendant's vehicle, and went to the public jacuzzi with Defendant.

171.   Without Jane Doe No. 5's knowledge or consent, Defendant ordered the bellhop at his resort take all of the items in Defendant's vehicle, to include Jane Doe No. 5's belongings, to his hotel suite.

172.   While in the public jacuzzi, instead of discussing business, Defendant made comments about his sexual desires and showed Jane Doe No. 5 pornography.

173.   Jane Doe No. 5 requested that Defendant take her home.

174.   Instead, Defendant insisted he had to go up to his room first.

175.   Once in his room, Defendant lured and enticed Jane Doe No. 5 to come upstairs by telling her she had to come get her surf gear and groceries, the hotel bellhop was not available to bring it back down, and he had to shower before he could drive her.

176.    Realizing she had no other way to get her belongings, Jane Doe No. 5 went to Defendant's room.

177.   When Jane Doe No. 5 arrived in the hotel room, Defendant had not showered yet and answered the door in his underwear.

178.   Defendant began insisting Jane Doe No. 5 take off her clothing and shower with him.

179.   When Jane Doe No. 5 refused, Defendant physically dragged her into the bathroom.

180.   Defendant then violently grabbed Jane Doe No. 5, and sexually assaulted her.

181.   Jane Doe No. 5 was afraid and was screaming, crying, and fighting back during Defendant's attack.

182.   During the attack, Defendant used his substantial strength and dislocated Jane Doe No. 5's shoulder, tore her labrum, and caused severe physical injury to her back and breast tissue.

183.   Jane Doe No. 5 was offered substantial and lucrative career opportunities by Defendant which caused her to travel to Cabo to meet with Defendant for that purpose.  Furthermore, Jane Doe No. 5 was able to retrieve her surf gear and groceries, which Defendant had commandeered to lure her to his suite.

184.   On July 9, 2021, Defendant, or someone acting at the direction of and/or in coordination with Defendant, posted a video to YouTube for public viewing, which identifies Jane Doe No. 5 by name and photograph and falsely accuses her of lying, sexual misconduct, and committing serious criminal activity, among other falsehoods.  Before it was removed, this video was viewed over 1,560 times and has over twenty comments.

185.   On or about July 31, 2021, Defendant began physically and verbally harassing Jane Doe No. 5 in the town in which she lives.  Subsequently, he created and printed paper flyers portraying Jane Doe No. 5's photograph and name along with false and harmful statements about her, accusing her of criminal activity, and Defendant has distributed, or caused to be distributed, these defamatory flyers around the community in which Jane Doe No. 5 currently resides.

186.   On October 6 and 7, 2021, Defendant, or someone acting at the direction of and/or in coordination with Defendant, posted two more videos to YouTube for public viewing, which identifies Jane Doe No. 5 by name and photograph and falsely accuses her of lying, sexual misconduct, and committing serious criminal activity, among other falsehoods.

187.   On November 9, 2021, Defendant, or someone acting at the direction of and/or in coordination with Defendant, posted a video to YouTube for public viewing, which identifies Jane Doe No. 5 by photograph and falsely accuses her of

lying, sexual misconduct, and committing serious criminal activity, among other falsehoods.  The video attempts to blur her face but does not do so in all captures.

188.   Furthermore, Defendant attempted to harm Jane Doe No. 5 when, after this lawsuit was filed, he purposefully ran into her with a surfboard, causing her injury.

189.   He further attempted to harm Jane Doe No. 5 after this lawsuit was filed, by telling active members of a drug cartel that Jane Doe No. 5 was a rival drug dealer.

190.   Consequently, Jane Doe No. 5 has been physically, psychologically, financially, and/or reputationally harmed by Defendant.

**F.**   **Jane Doe No. 6**

191.   Jane Doe No. 6 was trafficked when Defendant forced and/or coerced her to engage in commercial sexual acts while living under his roof.

192.   Jane Doe No. 6 met an advocate for Karma International, a self-proclaimed philanthropic organization.

193.   Jane Doe No. 6 was then invited to a party at Victorino Noval's house in Beverly Hills.  At that party, she was introduced to Peter Nygard, Defendant, and Steven Powers.

194.   Later, Jane Doe No. 6 rented a room in a property owned by Defendant.

195.   The first day Jane Doe No. 6 moved in at Defendant's property, Defendant coerced her into having nude photos taken of her with another woman.

196.   On two (2) occasions, Jane Doe No. 6 was sleeping and woke up to find Defendant on top of her, raping her.  Jane Doe No. 6 did not consent to this sexual act and on each occasion had her door locked prior to falling asleep.

197.   After each of the two (2) assaults, Defendant would provide $200 and clothing to Jane Doe No. 6 in "payment" for the sex acts.

198.   Defendant demanded that Jane Doe No. 6 not disclose the sex acts to his other "girlfriends," and cultivated an atmosphere of distrust and shame among

all women living in the residence. This behavior ranged from sexual abuse to maintaining a domineering, patriarchal presence in the household (*e.g.*, referring to the significantly younger women as his "kittens").

199.   Jane Doe No. 6 witnessed Defendant's efforts to evade service of the Complaint in this case when he ordered all members of the household to refuse packages, mail, or food deliveries.

200.   Defendant also demanded that if anyone came to the residence seeking to speak to him, that the residents falsely claim that they did not know him, or that he did not live there.

201.   Jane Doe No. 6 felt intimidated and frightened into silence when Defendant repeatedly asked her if she had spoken to the FBI.

202.   Jane Doe No. 6 felt further intimidated and frightened into silence when Defendant and others, including one of Defendant's "girlfriends," launched a coordinated attack against Jane Doe No. 6, falsely accusing her of theft and threatening her with arrest.

203.   Jane Doe No. 6 discovered legal documents that described Defendant strangling and physically assaulting another woman.  This frightened Jane Doe No. 6 greatly and caused her further concern for her own safety.

204.   Shortly thereafter, Jane Doe No. 6 managed to escape.

205.   On July 9, 2021, Defendant, or someone acting at the direction of and/or in coordination with Defendant, posted a video to YouTube for public viewing, which identifies Jane Doe No. 6 by name and photograph and falsely accuses her of lying, sexual misconduct, and committing serious criminal activity, among other falsehoods.  Before it was removed, this video was viewed over 1,560 times and has over twenty comments.

206.   On October 6 and 7, 2021, Defendant, or someone acting at the direction of and/or in coordination with Defendant, posted two more videos to YouTube for public viewing, which identifies Jane Doe No. 6 by name and

photograph and falsely accuses her of lying, sexual misconduct, and committing serious criminal activity, among other falsehoods.

207.   On November 9, 2021, Defendant, or someone acting at the direction of and/or in coordination with Defendant, posted a video to YouTube for public viewing, which identifies Jane Doe No. 6 by photograph and falsely accuses her of lying, sexual misconduct, and committing serious criminal activity, among other falsehoods.  The video attempts to blur her face but does not do so in all captures.

208.   Consequently, Jane Doe No. 6 has been physically, psychologically, financially, and/or reputationally harmed by Defendant.

**G.   Jane Doe No. 7**

209.   Jane Doe No. 7 was trafficked when Defendant engaged as an active participant in Nygard's sex trafficking venture and participated in a "sex swap" with Jane Doe No. 7 and another female.

210.   Jane Doe No. 7 was a sex trafficking victim of Nygard and the Nygard Companies.

211.   Nygard exploited his financial, physical, and psychological control over Jane Doe No. 7, which Defendant knew about, to force her to engage in sex acts with Defendant.

212.   Defendant participated in and benefited from the Nygard-Defendant Sex Trafficking venture.

213.   At a dinner party at Nygard's Marina del Rey Property, she met Defendant and his female companion.

214.   Defendant engaged in sex acts with Jane Doe No. 7 at Nygard's direction and against her will while Nygard engaged in sexual acts with the other female provided to him by Defendant.

215.   After the sex acts were complete, Defendant came downstairs and said, "Thanks, Peter."  In context, this comment was about the coerced sexual "swap" of women between Defendant and Nygard that had just occurred.

216.   Both the Defendant and Nygard traded in sex and used sex with young women and girls, such as Jane Doe No. 7, as their "currency."

217.   Defendant and Nygard each received sexual gratification in exchange for these sexual acts.

218.   Jane Doe No. 7 received something of value in exchange for the sex acts.   Namely, she was compensated financially, maintained employment, and avoided Nygard's wrath by complying with his demands.

219.   Consequently, Jane Doe No. 7 has been physically, psychologically, financially, and/or reputationally harmed by Defendant.

**H.   <u>Jane Doe No. 8</u>**

211.   At all relevant times to this Complaint, Jane Doe No. 8 was under the age of eighteen.

212.   While Jane Doe No. 8 was 17 years old, she was trafficked when Defendant engaged as an active participant in Nygard's sex trafficking venture and participated in a "sex swap" with Jane Doe No. 8 and another female.

213.   At this time, Jane Doe No. 8 was a sex trafficking victim of Nygard and the Nygard Companies.

214.   At this time, Defendant knew that Jane Doe No. 8 was a minor.

215.   On her first trip to California, she arrived at Nygard's Marina del Rey property where her passport was confiscated.

216.   Nygard exploited his financial, physical, and psychological control over Jane Doe No. 8, of which Defendant was aware.

217.   Defendant participated in and benefited from the Nygard-Defendant Sex Trafficking venture.

218.   At a dinner party at Nygard's Marina del Rey Property, Jane Doe No. 8 met Defendant and his female companion.

219.    Nygard, Defendant, and the other guests went to a party at the Playboy Mansion, to which a conversation ensued that Jane Doe No. 8 was not able to go because she was "too young," "innocent," and not 18 years old.

220.    Upon return from the party, Defendant and his female companion returned to Nygard's home.

221.    Nygard directed Jane Doe No. 8 to engage in sex acts with Defendant.

222.    Defendant engaged in sex acts with Jane Doe No. 8 at Nygard's direction and against her will, knowing she was underage.

223.    Defendant engaged in sex swaps with Defendant at Nygard's direction on other occasions as well.

224.    Both the Defendant and Nygard traded in sex and used sex with young women and girls, to include minors such as Jane Doe No. 8, as their "currency."

225.    Defendant and Nygard each received sexual gratification in exchange for these sexual acts.

226.    Jane Doe No. 8 received something of value in exchange for the sex acts.  Namely, she was compensated financially and avoided Nygard's wrath by complying with his demands.

227.    Consequently, Jane Doe No. 8 has been physically, psychologically, financially, and/or reputationally harmed by Defendant.

**I.     <u>Jane Doe No. 9</u>**

228.    Jane Doe No. 9 was trafficked when Defendant engaged as an active participant in Nygard's sex trafficking venture and participated in a "sex swap" with Jane Doe No. 9 and another female.

229.    Jane Doe No. 9 lived at Nygard's Marina del Rey property.

230.    While living at Nygard's property, Jane Doe No. 9 was repeatedly required to indulge Nygard's sexual appetites against her will.

231.    On multiple occasions while Jane Doe No. 9 was living there, Defendant came to Nygard's house with a female companion.

232.   On one such occasion, Nygard gave his guests a tour of his home and brought Defendant and Jane Doe No. 9 to his bedroom.

233.   Nygard instructed Jane Doe No. 9 to lie on his bed as he knelt down next to her on the bed and stated, "this is my best friend, you need to have sex with him!" referring to Defendant.

234.   At no point in time did Jane Doe No. 9 give her consent to Defendant.

235.   Defendant then vaginally raped Jane Doe No. 9 while Nygard became aroused and made loud and frantic noises.

236.   Nygard exploited his financial, physical, and psychological control over Jane Doe No. 9 to force and/or coerce her to engage in sex acts with Defendant.

237.   Defendant participated in and benefited from the Nygard-Defendant Sex Trafficking venture.

238.   Both the Defendant and Nygard traded in sex and used sex with young women and girls, such as Jane Doe No. 9, as their "currency."

239.   Defendant and Nygard each received sexual gratification in exchange for these sexual acts.

240.   Jane Doe No. 9 received something of value in exchange for the sex acts.   Namely, she was compensated financially, maintained employment, and avoided Nygard's wrath by complying with his demands.

241.   Consequently, Jane Doe No. 9 has been physically, psychologically, financially, and/or reputationally harmed by Defendant.

**J.**   **Jane Doe No. 10**

242.   Jane Doe No. 10 was trafficked when Defendant forced and/or coerced her to engage in commercial sexual acts while at his residence.

243.   Jane Doe No. 10's roommate was invited to a barbeque at Defendant's property by one of Defendant's employees.

244.   Jane Doe No. 10 and her roommate attended Defendant's party.

245.   At the party, Defendant then invited Jane Doe No. 10, her roommate, and several of the other guests to go to a "pamper party" at Peter Nygard's residence.

246.   Defendant provided the transportation to the "pamper party" for the attendees, to include Jane Doe No. 10.

247.   At "pamper parties," Nygard's victims were, at times, drugged when they were not agreeable to sexual acts with Nygard.

248.   Upon information and belief, Defendant knew that Nygard's employees would drug the drinks of selected victims.   These acts of drugging were not universally employed to partygoers, but rather were targeted to identified victims.

249.   At the "pamper party," Defendant provided a drink to Jane Doe No. 10, which, upon information and belief, was drugged.

250.   Upon information and belief, Defendant used his knowledge of the Nygard scheme and the availability of drugged drinks for non-compliant victims, to ensure that Jane Doe No. 10 would be appropriately vulnerable to Defendant's sexual desires.

251.   Soon after consuming the drink, Jane Doe No. 10 returned to Defendant's house with the other attendees.

252.   Jane Doe No. 10, her roommate, another woman, and Defendant went to the hot tub.

253.   Shortly thereafter, Jane Doe No. 10 did not feel herself, her head was spinning, and she did not feel in control of her body.

254.   While Jane Doe No. 10 was in this state, Defendant raped Jane Doe No. 10 on his bed.

255.   Jane Doe No. 10 took an Uber home after the rape with her roommate.

256.   The next morning, Jane Doe No. 10 received something of value when she woke up with two $100 bills next to her, which she understood was given to her by Defendant after the rape.

257.   Consequently, Jane Doe No. 10 has been physically, psychologically, financially, and/or reputationally harmed by Defendant.

**II.   Defendant Engaged in a Public Campaign to Intimidate and Harass Plaintiffs and Witnesses in Order to Obstruct Enforcement of the TVPRA.**

255.   Defendant is actively engaging in efforts to obstruct victims and witnesses from enforcing their rights under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), thus continuing, perpetuating, and attempting to conceal, his more than decade-long sex trafficking activities.

256.   In 2021, Defendant mapped out, with forethought and strategic vision, a "defense strategy" consisting of public humiliation, outing sex abuse survivors, and repeatedly and falsely accusing Plaintiffs and their counsel of serious violations of court rules and the law.

257.   Defendant did so maliciously with the intent of obstructing and interfering with Plaintiffs' enforcement of their rights under the TVPRA.

258.   For at least several months in 2021, and as recently as November 9, 2021, Defendant spearheaded an intimidation and harassment scheme to attack Jane Doe Plaintiffs in videos and social media posts by, among other tactics, publicly outing them and falsely accusing them of criminal conduct.

259.   Defendant's goal is to further terrify, intimidate, and harass Plaintiffs and other victims and witnesses into silence in an attempt to obstruct the enforcement of victims' rights under the TVPRA.

260.   After Defendant's scheme of trying to obstruct and tamper with the Jane Doe Plaintiffs was unleashed on the Internet, Plaintiffs requested multiple times that Defendant remove the inflammatory public posts. Defendant refused each time.

261.   Plaintiffs, therefore, were required to seek injunctive relief from the Court so that Defendant would discontinue his violations of the TVPRA.

262.   In the October 26, 2021, Preliminary Injunction hearing, the Court stated:

- "*It [the YouTube video] is designed clearly, and that would be the view of any judge who viewed it, and more importantly, any potential litigant who viewed it, as a means to punish and deter other plaintiffs and witnesses...*"[9];

- "I will again say the Court finds as a fact that the idea, that the purpose of the video was to learn anything or investigate, is a pretext. It is not. It is a contrivance. *It is, in fact, for the purpose of punishing people who have dared to make allegations against him in the United States District Court.*"[10]

263.   In its October 30, 2021, Preliminary Injunction Order (Doc. No. 73), the Court held:

- "The Court **FINDS** that Defendant Daniel S. Fitzgerald, or someone acting at his express direction, created YouTube videos, created social media accounts, and circulated copies of a flyer throughout Cabo, Mexico that, collectively, identified Jane Doe Nos. 4-6 and made disparaging attacks on their character and reputation.

- "The Court further **FINDS** that his motivation for doing so was not to collect information relevant to this action but to harass and impugn Jane Does from exercising their litigation rights and dissuading other victims from coming forward."

264.   Based on those findings, the Court Ordered (Doc. No. 73):

- "Now, therefore, Defendant Daniel S. Fitzgerald and his agents, servants, employees and attorneys, and other persons who are in

---

[9] Court Tr., October 26, 2021, p. 5, l. 1-4.

[10] *Id.*, p. 14, l. 16-21.

active concert or participation with them who receive notice of
this Preliminary Injunction by personal service or otherwise, are
hereby **ORDERED** and **ENJOINED** as follows during the
pendency of this litigation:

    1. From publishing, posting, or otherwise publicly circulating
       information that personally identifies Plaintiffs, either by
       name or description.

    2. From directly or indirectly making any harassing or
       threatening communications to anyone directly connected
       with this lawsuit, including but not limited to Jane Doe
       Nos. 1-10, or any lawyers representing Jane Doe Nos. 1-
       10.

    …

    4. From performing any of these actions through another
       person or by use of a subterfuge.

    5. Defendant Daniel S. Fitzgerald is **ORDERED** to remove
       the video identified in the record from YouTube and to
       remove any similar videos from any social media platform.
       Defendant Daniel S. Fitzgerald is likewise **ORDERED** to
       deactivate the social media or email accounts identified in
       the video."

265.   When Defendant's public intimidation and obstruction campaign was
unveiled in or around June/July 2021, Defendant denied any connection to, or
involvement, in the harassment and obstruction efforts.

266.   Since at least June of 2021, Defendant has been designing, building,
and circulating working copies of the videos and social media posts that are the
subject of this Court's Preliminary Injunction Order.

267.   On June 24, 2021, Defendant emailed Steven Powers: "Try to make your WhatsApp work so I can send you *those nice videos <u>we're</u> making*." (emphasis added).

268.   The same day, Defendant texted Powers, "Going to send you the stuff now," attaching numerous lengthy video clips:



269.   Those video clips and images were further edited and became the July 2021 YouTube videos and social media posts that were the subject of this Court's Preliminary Injunction Order.

270.   At the beginning of the first video clip, the speaker says, "Ok, so the video is finished…."

271.   Examination shows that video editing software (iMovie) is being used. In the top left, there are eight listed items in white font. These are lists of "digital

elements," which are repositories of video clips to compile for completed videos. ***The first digital element is entitled, "Danny [Jane Doe No. 5 name]," the fourth project name from the top is entitled, "Danny Defendant,"*** and the project name, which appears directly above the red box, is entitled, "[Jane Doe No. 5's first name] project."

272.   These videos were working copies of what was published two weeks later.

273.   On June 25, 2021, Defendant sent Powers another email: "Do you have any more good information or any evidence we can use to build this case better ***and to build <u>this</u> video better***."

274.   On July 12, 2021, the day the videos were first published on the "Not Me Movement" YouTube channel, Defendant sent Powers a link to the video.

275.   Defendant's video concocted myriad defamatory conspiracy theories and untrue statements besmirching Plaintiffs and their counsel.

276.   On August 12, 2021, one month after the release of the first YouTube video, and immediately after the belated but staunch denial from Defendant of his involvement, the following private exchange occurred between Defendant and Powers:

- **Defendant**: "How is everything going hope you did not settle with those assholes. They have basically pulled my case because they have nothing so I think my case is disappearing."

- **Mr. Powers**: "I haven't settled yet I offered him a crazy deal **they told me they are worried about <u>*that video you did*</u> so that was a good job**."

- **Mr. Defendant**: "<u>***More to come***</u>. They were supposed to refile their amended Case by the 22nd of July and they haven't done anything I think they have nothing ***<u>and they're scared</u>***."

277.   Defendant's conduct was intended to strike fear into Plaintiffs and their counsel – to intimidate and obstruct their attempts to bring this case, and to intimidate additional witnesses from coming forward.

278.   In its Preliminary Injunction Order (Doc No. 73), incorporated herein by reference, the Court stated: "The Court further **FINDS** that his motivation for doing so was not to collect information relevant to this action but to ***harass and impugn Jane Does from exercising their litigation rights and dissuading other victims from coming forward***."; Court Tr., p. 14, l. 16-21 ("I will again say the Court finds as a fact that the idea, that the purpose of the video was to learn anything or investigate, is a pretext. It is not. It is a contrivance. It is, in fact, for the purpose of punishing people who have dared to make allegations against him in the United States District Court."). *Id.*, p. 2, l. 8-10.



279.   Defendant then launched the next phase of his obstruction and tampering scheme.

280.   Just days after the Court issued the Preliminary Injunction, Defendant released another video that he designed and/or spearheaded. It was published on the same "Not Me Movement" YouTube channel as the July videos, and contains the same themes, allegations, conspiracy claims, and attacks on Jane Doe Plaintiffs and their counsel, with nearly identical verbiage in multiple places:[11]

a) Claiming Plaintiffs in this case and in the case against Peter Nygard are lying and committing perjury;

b) Disparaging and defaming Plaintiffs' counsel as being part of a global conspiracy to bribe and induce women to lie to this Court and the FBI, along with claims of witness tampering, bank fraud, burglary, extortion, fraud, elder abuse, and blackmail; and

c) Depicting images of Jane Doe Nos. 4-6 (but this time, after the Court's Order, the faces are pixelated in most but not all of the images in the video).

d) Showing a videotaped "interview" of Powers in which Jane Doe No. 2, another sex trafficking survivor, is unmasked and repeatedly shows her face and name.

281.   In its previous Orders and rulings, the Court found the July 2021 video on the "Not Me Movement" YouTube channel and the related Instagram posts were attributable to Defendant.

282.   Equally, Defendant spearheaded the design and publication of the November 9, 2021, video, which is strikingly similar to the July video in content, verbiage, themes, tone, images, and targets.

---

[11] Table 1 annexed to Plaintiffs' Motion for Contempt, incorporated herein by reference, is a compendium of quotes and content from the YouTube videos and social media posts showing, among other things, a plethora of libelous statements about Plaintiffs, including claims that they are lying, committing bribery and fraud, and have engaged in burglary and bank.

283.   Defendant has a strong motivation to vouch for Nygard's innocence since they are co-conspirators, and he specifically told Jane Doe No. 5 he would do just that:

> Peter is getting off on everything. We're just friends, ok?...  He's my friend, and ok, and *I'll help my friend out, ok. I'll testify for him. That's what friends do.* He's taken me around the world in his jet. He's been my friend, he's invited me to parties, I've played poker at his house for 30 years, ok.

284.   Nygard echoes Defendant's sentiments and confirms that Defendant is one of his best friends.

285.   In addition to their public campaign, described above, Defendant's and Defendant's co-conspirators' violent and ongoing conduct created extraordinary circumstances that Plaintiffs justifiably feared for their well-being and their lives, and they were obstructed from meaningfully pursuing their claims any sooner than the date this lawsuit was filed.

286.   As is relevant here, where Defendant engaged in sex trafficking through the "swap" of Nygard's "girlfriends," Nygard and his co-conspirators and enterprise associates used various methods, including payments, to silence and intimidate such victims: "*In some instances, Nygard intended these payments to secure a victim's silence.  In other instances, Nygard intended these payments to facilitate future sexual activity with the victim induced through force, fraud, and coercion*." Ex. 1, ¶ 13 (emphasis added).

287.   Nygard and his co-conspirators and enterprise associates cultivated a decades-long and industry-wide reputation, known to Plaintiffs, for silencing those who would speak out against them. The DOJ Indictment details the psychological coercion and manipulation that the Nygard enterprise uses to silence its victims: "Nygard maintained control over his victims through threats, promises to grant or withhold modeling opportunities and other career advancement, granting and

1  withholding of financial support, and by other coercive means, including constant
2  surveillance, restrictions of movement, and physical isolation." *Id.*, ¶ 12.

3  288.  Indeed, it was widely reported, and known to Plaintiffs, that many
4  victims had sought help through law enforcement and through the Nygard
5  Companies, but were rebuffed, intimidated, silenced, and destroyed.  The DOJ
6  Indictment states that Nygard and other members of the Nygard enterprise "engaged
7  in obstructive conduct aimed at preventing witnesses from reporting Nygard's sexual
8  crimes." *Id.*, ¶ 3.  Defendant is actively doing the same right now.

9  289.  Such intimidation includes not only direct threats, but also the publicly
10 known, decades-long reputation for silencing those who would speak out against
11 Nygard and his co-conspirators and enterprise associates, such as Defendant – a
12 reputation known to Plaintiffs and indeed known throughout the fashion industry
13 and the entire social scene in which Nygard, Defendant, and their victims traveled.
14 In the Canadian Arrest Warrant related to the DOJ Indictment and Extradition of
15 Peter Nygard, evidence is put forth that Nygard and the Nygard enterprise used
16 "corporate employees and funds to quash negative publicity related to allegations of
17 sexual assault and sex trafficking and to engage in illegal witness tampering." *See*
18 annexed Ex. 2, at ¶ 7(s)(vi).  Defendant's defamatory videos and social media posts
19 are all intimidating witness tampering techniques with malicious intent.

20 290.  In a January 5, 2021, letter, acting United States Attorney for the
21 Southern District of New York, Audrey Strauss, stated: "Moreover, during the past
22 several decades, Nygard has repeatedly engaged in efforts to obstruct justice and
23 tamper with potential witnesses against him.  These efforts have included paying
24 witnesses to provide information that Nygard knew to be false, monitoring contact
25 between victims and U.S. law enforcement, and providing false information to
26 witnesses, including those Nygard knew had been contacted by U.S. law
27 enforcement." *See* annexed Ex. 3, at p. 2.  Similarly, Defendant harassed an alleged
28

Jane Doe to try to determine if she had spoken to the FBI and to attempt to silence her.

291. Nygard and his co-conspirators and enterprise associates, including Defendant, engage in myriad coercive methods of intimidation, bribery, and witness tampering, including as recently as 2019 and 2020, in order to suppress the truth about Nygard's sex trafficking conspiracy, including as it relates to Plaintiffs:

*Obstruction of justice/witness tampering –*

(aa) ***During the past several decades, NYGARD has also repeatedly engaged in efforts to obstruct justice and tamper with potential witnesses against him. These efforts have included paying witnesses to provide false information***, monitoring contact between victims and U.S. law enforcement, and ***providing false information to witnesses, including those NYGARD knew had been contacted by U.S. law enforcement***; Examples include:

(iii) In or about 2016, after learning about a federal criminal investigation, NYGARD directed Victim-6 to provide testimony establishing that Minor Victim-1 was an adult under U.S. law, when she travelled with NYGARD. Victim-6, who believed at the time that Minor Victim-1 was 18 or older, agreed, and offered sworn statements at what she understood to be a civil deposition. After NYGARD subsequently rewarded her with a $2,000 cash bonus, she later learned that Minor Victim-1 was under age 18;

(ii) Messages recovered from NYGARD's phone demonstrate that in or about December of 2019, a witness who had been lawfully served by the FBI with a subpoena ("Female-2") sent NYGARD a photograph of the FBI agent's business card. About 20 days later, NYGARD sent Female-2 another message falsely telling her that the agent was a "fake."

* * *

(iii) ***Another longtime "girlfriend" ("Female-3") advised Victim-3 that in the summer of 2020, after the U.S.***

> *investigation had been revealed, NYGARD contacted Female-3 from another person's phone to convey, in substance, that if she were not on his "side" then she was "going down."*

Ex. 2 at ¶¶ 18-19 (emphasis added).

292.   Due to the violent nature of rape and the brutal methods of abuse and psychological coercion and manipulation employed by Nygard, Defendant, and other associates of the Nygard enterprise against Plaintiffs, along with the coordinated methods of control, coercion, fraud, and intimidation, Plaintiffs legitimately feared—and continue to fear—for their lives and their safety.

293.   As noted above, Defendant, Nygard, and the Nygard enterprise also use violence, threats of violence, bribery, and corruption to intimidate and silence their victims and those that they believe have "betrayed" them.  Defendant, Nygard, and the Nygard enterprise have silenced their victims by, among other means, having their tires slashed, committing arson, hiring thugs to intimidate their victims, having their victims followed, engaging in murder-for-hire plots, threatening them via social media and other mediums, and otherwise threatening their victims with death.

294.   Moreover, Nygard's and the Nygard enterprise's intimidation in the form of coordinated displays of power and international influence, both monetary and political, have continuously led Nygard's and the Nygard enterprise's many victims, which include Plaintiffs here in coordinated assaults by Nygard and Defendant, to believe that they would have no safe or effective avenue for relief for pursuing their claims.

295.   Nygard's confirmed and alleged payoffs to law enforcement in the Bahamas and Canada, repeated statements to victims such as, "I own the police," and his hiring of Bahamian police officers as security guards for his pamper parties and other events at Nygard Cay at which women and girls were drugged and raped, all served to send a clear and consistent message to victims that they would not be safe to report their victimization to law enforcement.

296.   Plaintiffs knew they could be found and harmed at any time by Nygard, Defendant, or their other associates in the Nygard enterprise, as it was routine practice for Nygard to keep victims' passports and other identification, or copies thereof, in his private possession, typically in a locked cabinet.

297.   The crimes here were committed by both Nygard and Defendant, who conspired with each other to traffic Plaintiffs, thus invoking the fear based on the Nygard enterprise's sprawling intimidation machine.

298.   This control, manipulation, and intimidation rendered Nygard's and the Nygard enterprise's victims, which include Plaintiffs here, effectively incapacitated from being able to understand and assert their rights.  Plaintiffs thus have been effectively prevented until now from exercising their rights to confront Defendant, Nygard, and the Nygard Companies – prevented until they were assured that authorities were investigating the Nygard enterprise's crimes in earnest, that their identities would be protected, and, ultimately, that Nygard and his enterprise would not be free to wield their considerable influence to harm them for pursuing justice against him and his co-conspirators.

299.   The violent nature of rape and the brutal methods of abuse,[12] along with the coordinated methods of coercion and intimidation by Nygard and co-conspirators, caused Plaintiffs significant mental and emotional harm such that they

---

[12] "Rape is one of the most severe of all traumas, causing multiple, long-term negative outcomes, such as post-traumatic stress disorder (PTSD), depression, substance abuse, suicidality, repeated sexual victimization, and chronic physical health problems." Kilpatrick, D. G., & Acierno, R.: "Mental health needs of crime victims: Epidemiology and outcomes." Journal of Traumatic Stress, Vol. 16, 2003, pp119–132.

felt they could not re-traumatize[13] [14] themselves or further endanger themselves by going up against powerful men, backed by global corporations and corruption. "[T]he trauma experienced by victims of trafficking includes anxiety, depression, alienation, disorientation, aggression, suicide ideation, attention deficit, and post-traumatic stress disorder (PTSD)."[15] Further, that "trauma worsens during the trafficking process and persists far beyond the end of any exploitation."[16]

300.   Studies show that rape is one of the least reported of all violent crimes in the United States and that victims do not report because of fear of retaliation from their perpetrator.

301.   Studies also show that negative social consequences to disclosing rape to family members and friends form significant inhibitions, further incapacitating victims to speak about their experiences even to people they love and trust.  These include notions of becoming an emotional burden, experiencing a loss of privacy, being shamed and blamed, being disbelieved, being labelled (and as such, being unable to move out from under a negative label, such as "victim," "whore," "dirty," "tainted," "weak"), and being the cause of mental and emotional strife for the person/people they disclose to.

302.   It is also common for rape survivors to fear violent retaliation against their attacker by family members and friends, particularly male.  Thus, they will

---

[13] "When victims reach out for help, they place a great deal of trust in the legal, medical, and mental health systems as they risk disbelief, blame, and refusals of help. How these system interactions unfold can have profound implications for victims' recovery."  Campbell, Rebecca, "The Psychological Impact of Rape Victims' Experiences With the Legal, Medical, and Mental Health Systems," American Psychologist, November 2008, p. 702.

[14] "Post-assault help seeking can become a "second rape," a secondary victimization to the initial trauma."  Campbell, R., & Raja, S., "The secondary victimization of rape victims: Insights from mental health professionals who treat survivors of violence." *Violence & Victims, 14,* 2008, 261–275.

[15] Okech, David, *et. al.*, "Social Support, Dysfunctional Coping, and Community Reintegration as Predictors of PTSD Among Human Trafficking Survivors."  Behavioral Medicine, Vol. 44, 2018, 209-218).

[16] *Id.*

*Jane Doe Nos. 1-10 v. Daniel S. Fitzgerald*, Case No. 2:20-cv-10713-MWF-RAO
FOURTH AMENDED COMPLAINT

avoid disclosing their victimhood in order to ensure that their brothers, fathers, husbands and other male friends and relatives do not cause physical harm to their rapists which would in turn put those friends and relatives at risk of being charged and convicted of criminal offences themselves.  This is best illustrated in victims' responses to interview questions by lawyers, law enforcement and therapists such as, "Why didn't you tell anyone?" Victim response: "I knew my dad/brother/boyfriend would find him and kill him, so I kept it to myself.  I didn't want [relative] to go to jail."

303.   The DOJ Indictment corroborates that the Nygard enterprise employed various resources "to intimidate, threaten, and corruptly persuade individuals who alleged that Nygard was engaged in sexual assault and sex trafficking in the United States, Bahamas, Canada and elsewhere, including by paying witnesses for false statements and affidavits; threatening witnesses with arrest, jail, prosecution, civil litigation, and reputational harm; and attempting to cause reputational harm and discredit potential witnesses by disseminating false or embarrassing information." Ex. 1 at ¶ 10(h).

304.   In this case, Defendant has already indicated his intention to "out" Plaintiff Jane Doe Nos. 1-10 and discredit them by claiming they have brought this case not for the truth, but rather, because they are simply "looking for a payday." Defendant has, in fact, already made good on this by posting, or causing to be posted, to YouTube false and defamatory videos concerning Jane Doe Nos. 2, 4, 5, and 6 and by creating and distributing defamatory flyers concerning Jane Doe No. 5 throughout her community.

305.   Defendant attempted to harm Jane Doe No. 5 when, after this lawsuit was filed, he purposefully ran into her with a surfboard, causing her injury.

306.   He further attempted to harm Jane Doe No. 5 after this lawsuit was filed, by telling active members of a drug cartel that Jane Doe No. 5 was a rival drug

dealer.  (If a cartel leader believed her to be such a rival, this would likely result in Jane Doe No. 5's death).

307.   Because of the actions by Nygard and other associates of the Nygard enterprise, including Defendant, victims reasonably fear for their lives, particularly given the violent nature of the crimes, the reasonable belief that attempting to report such crimes is hopeless, and the careful coordination by the Nygard enterprise of the methods of violence and intimidation, including false imprisonment, drugging, and threats.

308.   Likewise, in accordance with the practices of the Nygard enterprise, Defendant himself has used violence against his victims to force their silence and acquiescence.

309.   Cases associated with the Nygard-Defendant Sex Trafficking venture involving Nygard and Defendant present a unique set of circumstances that require a unique perspective.  The confluence of myriad factors, listed below, led each of the Jane Does to a legitimate fear for her and her family's livelihood, safety, and well-being, thus incapacitating Plaintiffs from practically and effectively understanding and asserting their rights.  The factors eliciting fears of death, bodily and psychological harm, and other grievous injury in this case are:

    a.  The Nygard enterprise's wealth and connection to prominent politicians and law enforcement agents in multiple nations;

    b.  Nygard's and Defendant's brutal and coordinated violent rapes;

    c.  Nygard instructing and coercing women to have sex with his close friend and co-conspirator, Defendant;

    d.  Defendant's wealth and use of violence to suppress his victims;

    e.  Defendant's indifference to the rules of law by his rape and trafficking of women;

    f.  Nygard's and Defendant's utter indifference to the rules of law by their brazen violent acts;

g. Nygard's abilities to manipulate and control people, honed by his own malignant narcissism, as well as his relentless study of dictators such as Hitler and cult leaders such as Jim Jones;

h. Nygard's, Defendant's, and the Nygard enterprise's sprawling infrastructure of employees and "girlfriends" that, to please Nygard and/or avoid reprisal by him, enticed, lured, recruited, transported, harbored, maintained, and intimidated witnesses;

i. The Nygard enterprise's active intimidation tactics, including constant surveillance and other harassment measures; and

j. The Nygard enterprise's known connections to organized crime and other underground figures, such as drug dealers, murderers, and gang members (demonstrated poignantly by Hell's Angel associate and convicted drug trafficker, Steve Mager, being one of two people previously attempting to post surety to allow for Nygard's release from jail in Canada).

310. Further, Nygard and his conspirators and enterprise associates actively coordinated to brainwash, shame, intimidate, and terrify victims, including Plaintiffs, into a cult-like, paralyzing fear that prevented them from being able to understand and/or assert their rights prior to filing this suit.  Nygard and his conspirators honed patterns of praise-berate-reward-punish behaviors that pulled victims into a control cycle of adjusting their responses to such behaviors in order to elicit the positive and avoid the negative, to the point that some became unable at various points to know right from wrong, or to distinguish between helpers and harmers.  This allowed victims, including Plaintiffs, to be held as indentured laborers by what are known in trafficking lingo as "the invisible chains," and to remain devoid of the knowledge or understanding that what was happening to them was indeed criminal.

311.   Nygard's control of people, particularly his "girlfriends" such as Plaintiffs, was complete and ruthless.  He would withhold passports, payment, travel, and lodging, unless his every demand was met.  He monitored and restricted food intake and employed sleep deprivation tactics as further methods of psychological control.  He disallowed privacy, constantly surveilling and recording his "girlfriends'" and employees' every activity.  Any protest or attempt to fight back was met with swift and cruel retribution, including physical and sexual assaults and extreme humiliation.

312.   Further, even after his victims leave his direct control, Nygard often continues to attempt to contact them, in an intimidating manner, intending to instill fear in his victims and remind them of his power and ability to hurt them.

313.   In some cases, such as with Jane Doe No. 4, instead of letting this victim leave his control, Nygard instead "passed" her to Defendant for further manipulation, control, sex trafficking, and abuse.  Consequently, instead of being free of her trafficker, Jane Doe No. 4 was trafficked and further abused within the criminal enterprise by Defendant.

314.   Further, the convoluted structure of the venture and scheme alone, including the murky corporate waters of the Nygard Companies, as well as the labyrinth of covert recruiters, obfuscated the true nature of the venture, thus concealing the true landscape from victims, including Plaintiffs.

315.   Those who got caught for any length of time in Nygard's scheme often came to believe that he cared about them, since he frequently pointed out how lucky they were to have the opportunities for career growth, travel, and industry connections that he claimed to be providing. Typically, it is only through psycho-education about trafficking given by experts (therapists, lawyers, victim advocates, law enforcement), or through learning about the trafficking experiences of others in books, film, and media that trafficking victims enlighten to the fact that their

"friend," "boyfriend," "agent," or "employer," was actually a pimp, recruiter, or trafficker.

316. Due to the temporal, geographical, and numerical breadth of Nygard's and Defendant's schemes, and due to the success of Nygard's and Defendant's efforts to suppress knowledge and conceal information about their schemes, and due to Plaintiffs' justifiable lack of knowledge of such facts until now, it would have been impossible for Plaintiffs to know or understand many of the claims they have against Defendant, Nygard, or the Nygard Companies.

317. Plaintiffs largely were not aware of the wide-ranging scheme of abuse outside of their own victimization, and thus could not have known of a broader enterprise or trafficking scheme – in part due to ignorance of the legal protections available to them and in part due to Defendant's concerted efforts to obfuscate his and Nygard's crimes.

318. Compounding the belief that they were isolated and alone in their victimization are the negative cognitions of self (*i.e.*, "I am powerless," "I am worthless," "It's my fault," "I'm stupid," "I'm dirty") that form in response to trauma, particularly sexual trauma. These beliefs combine with anticipated social reactions and consequences (such as people impugning their motives if they do come forward) to play a significant psychological role in immobilizing the victim from coming forward.[17]

319. Nygard and his conspirators and enterprise associates stepped up their intimidation tactics in the last two years. In the summer of 2019, Nygard became aware that the *New York Times* was actively investigating his sex trafficking venture.

320. Nygard also became aware that the FBI and DOJ were investigating his sex trafficking venture when they raided his New York and California properties on February 26, 2020.

---

[17] Ahrens, Courtney, "Being Silenced: The Impact of Negative Social Reactions on the Disclosure of Rape," American Journal of Community Psychology, Vol. 38, 2006, pp. 263-274.

321.   In response, in addition to Defendant's overt acts described above, Nygard took several offensive measures to try to keep his sex trafficking venture concealed, including threatening the *New York Times*, suing the *New York Times*, concocting false conspiracy theories, and enlisting his most trusted "girlfriends" and associates to cover-up his and their crimes.  Upon information and belief, these individuals were paid thousands of dollars in cash and benefits during 2019 and 2020 to keep quiet and lie for Nygard.

322.   The intimidation tactics of Nygard are acutely relevant in this case because Jane Does here are the victims of a conspiracy between Nygard and Defendant to sex traffic, rape, sexually assault, and/or sexually batter them.  Both Nygard and Defendant are complicit and liable for the acts herein alleged.

323.   Further, prior to Nygard's indictment by the U.S. federal government and arrest, Defendant communicated with Nygard on options to flee the jurisdiction and get to a country without extradition treaties to the U.S.

324.   Due to Defendant's conspiracy and enterprise with Nygard, and his close association with him as a recruiter and fellow sex trafficker, Plaintiffs legitimately feared for their lives as well as other forms of retaliation if they pursued claims against Defendant for trafficking them.

## CLAIMS ALLEGED

## COUNT I

### VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION REATHORIZATION ACT, 18 U.S.C. § 1595

325.   Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1-324, as if fully set forth in this Count.

326.   Pursuant to 18 U.S.C. § 1595, a civil action may be brought for any violation of Chapter 77 against (1) the perpetrator or (2) whoever knowingly benefits, financially or by receiving anything of value from participation in a venture

which that person knew or should have known has engaged in an act in violation of this chapter.

327.   The acts described herein occurred in or affected interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States.

328.   **18 U.S.C. §§ 1591(a)(1) and 1595(a):** Plaintiffs are victims of violations of Chapter 77 of Title 18 of the United States Code, to wit, 18 U.S.C. §§ 1591(a)(1) and 1595(a), insofar as:

a)   For Plaintiffs 1-4, and 7-9, Defendant, Nygard, the Nygard Companies, and others acting in concert with them knowingly recruited, enticed, harbored, transported, provided, obtained, maintained, patronized, and/or solicited Plaintiffs by multiple means to commit one or more commercial sex acts [as defined at 18 U.S.C. § 1591(e)(3)].

b)   For Plaintiffs 5, 6, and 10, Defendant knowingly recruited, enticed, harbored, transported, provided, obtained, maintained, patronized, and/or solicited Plaintiffs by multiple means to commit one or more commercial sex acts.

c)   For all adult Plaintiffs (Jane Doe Nos. 1-7, 9-10), Defendant, Nygard, the Nygard Companies, and/or others acting in concert with them committed the acts described above knew or should have known that means of force, threats of force, coercion [as defined at 18 U.S.C. § 1591(e)(2)], or any combination of such means would be used to cause Plaintiffs to engage in one or more commercial sex acts.

d)   For the minor Plaintiff, Jane Doe No. 8, Defendant, Nygard, the Nygard Companies, and/or others acting in concert with them committed the acts described above knew or should have known, that the Plaintiff had not yet reached 18 years of age and would be caused to engage in one or more commercial sex acts.

329.   **18 U.S.C. §§ 1591(a)(2) and 1595(a):** All plaintiffs are victims of violations of Chapter 77 of Title 18 of the United States Code, to wit, 18 U.S.C. §§ 1591(a)(2) and 1595(a), insofar as for Plaintiffs, Defendant, Nygard, the Nygard

Companies, and others acting in concert with them, knowingly benefitted, financially or by receiving anything of value, from participation in a venture [as defined at 18 U.S.C. § 1591(e)(6)] which Defendant knew or should have known had engaged in recruiting, enticing, harboring, transporting, providing, obtaining, maintaining, patronizing, and/or soliciting Plaintiffs by multiple means to commit one or more commercial sex acts.

330.   For all adult Plaintiffs (Jane Doe Nos. 1-7, 9-10), Defendant, Nygard, the Nygard Companies, and/or others acting in concert with them committed the acts described above knew or should have known that means of force, threats of force, coercion [as defined at 18 U.S.C. § 1591(e)(2)], or any combination of such means would be used to cause Plaintiffs to engage in one or more commercial sex acts.

331.   For the minor Plaintiff, Jane Doe No. 8, Defendant, Nygard, the Nygard Companies, and/or others acting in concert with them committed the acts described above knew or should have known, that the Plaintiff had not yet reached 18 years of age and would be caused to engage in one or more commercial sex acts.

332.   **Conspiracy to Violate TVPRA:** In relation to Jane Doe Nos. 1-4 and 7-9:

a)   Defendant conspired, by agreement or understanding, to further Nygard's unlawful plan and/or purpose to commit illegal commercial sex acts with Plaintiffs.

b)   Defendant committed overt acts in furtherance of the agreement or understanding by playing an active role in trafficking Plaintiffs and by engaging in commercial sex acts with them.

c)   Defendant and/or his co-conspirators provided or promised Plaintiffs items of value in exchange for engaging in the sexual acts with Defendant, including but not limited to, air flights, lodging, food, employment and cash.

d)   Defendant's participation in the furtherance of Nygard's illegal sex trafficking venture, plan, and/or purpose was intentional and/or willful and,

therefore, Defendant intentionally and/or willfully caused Nygard's facilitation of the sex acts with Plaintiffs in his affirmative acts supporting Nygard.

e)      Defendant knew that his acts and conduct supporting and facilitating Nygard would lead to unlawful commercial sex acts facilitated by Nygard and involving Plaintiffs.

f)      Defendant conspired with Nygard through his affirmative acts and provided substantial support to Nygard causing commercial sex acts upon Plaintiffs.

333.   **18 U.S.C. §§ 1591(d) and 1595(a):** Jane Doe Nos. 2, 4, 5, and 6 are victims of violations of Chapter 77 of Title 18 of the United States Code, to wit, 18 U.S.C. § 1591(d), insofar as Defendant, Nygard, the Nygard Companies, and/or others acting in concert with them obstructed, attempted to obstruct, and/or interfered with or prevented the enforcement against them of 18 U.S.C. § 1591 in connection with their actions of which Plaintiffs were victims.

334.   Defendant's violations of 18 U.S.C. § 1591, giving rise to a cause of action under 18 U.S.C. § 1595, have continued without interruption since Defendant first met Plaintiffs.

335.   Defendant's conduct has caused and continues to cause Plaintiffs serious and permanent harm, including, without limitation, physical, nonphysical, psychological, financial, and reputational harm.

336.   Under the TVPRA, 18 U.S.C. § 1595, Plaintiffs are entitled to recover from Defendant damages and reasonable attorney's fees.

## COUNT II

## SEXUAL BATTERY IN VIOLATION OF CALIFORNIA CIVIL CODE § 1708.5 AND COMMON LAW

337.   Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1-324, as if fully set forth in this Count.

338.   Defendant intentionally committed sexual battery on all Plaintiffs in the State of California in violation of California law.

339.   Defendant acted with the intent to cause a harmful and offensive contact with an intimate part of each Plaintiff, and a sexually offensive contact with each Plaintiff directly or indirectly resulted.

340.   Defendant acted with the intent to cause a harmful and offensive contact with each Plaintiff, by use of his intimate parts, and a sexually offensive contact with each Plaintiff directly or indirectly resulted.

341.   Defendant also acted to cause an imminent apprehension or fear of a harmful and offensive contact with each Plaintiff's intimate parts.

342.   Plaintiffs did not consent to Defendant's harmful and offensive contact and/or were coerced in to such harmful and offensive contact.

343.   Plaintiffs were harmed and/or offended by Defendant's conduct. Defendant's conduct has caused Plaintiffs serious and permanent harm and/or damages, including, without limitation, physical, psychological, emotional, financial, and reputational harm.

## <u>COUNT III</u>

**CIVIL CONSPIRACY IN VIOLATION OF CALIFORNIA LAW**

344.   Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1-324, as if fully set forth in this Count.

345.   In relation to Jane Doe Nos. 1-4 and 7-9, Defendant, Nygard, and the Nygard Companies have participated in the continuing conspiracy to commit sexual battery and to cover-up their conspiracy.

346.   Defendant, Nygard, and the Nygard Companies formed a group of two or more persons who conspired and agreed to a common plan or design to commit tortious acts, including sexual battery.

347.   Defendant had actual knowledge that tortious acts including sexual battery were planned by him and his co-conspirators, and he concurred and participated in the tortious scheme with knowledge of its unlawful purpose.

348.   Defendant intended to aid his co-conspirators in the commission of the planned tortious acts, including sexual battery.

349.   Defendant committed numerous wrongful acts, including sexual battery, against Plaintiffs in the State of California pursuant to his agreement with his co-conspirators.

350.   Defendant's affirmative conduct in furtherance of the conspiracy was undertaken with the express and/or implied agreement or understanding that Nygard would use the Nygard Companies' money and brand, the promise of modeling careers, and his influence in the fashion industry to facilitate and/or enable the sexual battery of Plaintiffs.

351.   Jane Doe Nos. 1-4 and 7-9 were battered and damaged as a direct result of Defendant's agreement and actions in furtherance of the conspiracy.

352.   Defendant's conduct has caused and continues to cause Jane Doe Nos. 1-4 and 7-9 serious and permanent harm and/or damage, including, without limitation, physical, psychological, emotional, financial, and reputational harm.

### COUNT IV

### LIBEL IN VIOLATION OF
### CALIFORNIA CIVIL CODE § 45

353.   Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1-324, as if fully set forth in this Count.

354.   Defendant intentionally published, or caused to be published, false and harmful statements through videos published on a YouTube Channel called the "Not Me Movement."

355.   On or about July 9, 2021, October 6, 2021, October 7, 2021, and November 9, 2021, videos were published on this channel about Jane Doe Nos. 4, 5,

1  and 6, with knowledge of their falsity, on the internet for public viewing, including

2  accusing them of criminal activity and sexual misconduct, among other things.

3     356.  In the YouTube video published on July 9, 2021, available for public

4  viewing, Defendant falsely and collectively referred to Jane Doe Nos. 4, 5, and 6 as:

5     a.  "evil prostitute[s]," "[] serious drug addict[s]," "fraud girls and all the

6  other phony Jane Does," "sex trafficker[s]," and "devil worshipper[s]", committing

7  extortion, partaking in "blackmail," engaging in "satanism" and "witchcraft," and

8  "stealing from innocent families;"

9     b.  "[w]hat these girls are doing is elderly endangerment, extortion, credit

10  card fraud;" and

11     c.  "These types women achieved their monetary goals by going on social

12  media and other dating sites showing their bodies so that they can date old powerful

13  men that they will eventually end up suing and blackmailing, threatening if they

14  don't respond with their ridiculous demands." (YouTube video annexed as Exhibit

15  2).

16     357.  Specifically, as to Jane Doe No. 6, Defendant falsely states in the July

17  9, 2021, YouTube video that she is "another evil prostitute that has done many illegal

18  and wrongful actions against innocent people. She sleeps for money with very

19  wealthy old men." *Id.*

20     358.  Specifically, as to Jane Doe No. 5, Defendant falsely states in the July

21  9, 2021, YouTube video that:

22     a.  "This woman should be sitting in jail, not on first class flights to remote

23  destinations with the money that she stole from hard working and innocent families;"

24     b.  "[Jane Doe No. 5's] biggest weapon is her social media. She uses it to

25  attack and defame innocent people. It is a shame how many lives she has ruined;"

26     c.  "[Jane Doe No. 5] has working prostitutes all over the world. She is in

27  charge in setting them up with Rich People, at first for money and later using them

28  for creating false accusations of rape or sexual assault with the crooked Gutzler or

Haba Law firms. Lots of this type of girls are present in fake declarations reading their false illegal scripts to the FBI;"

d.     "[Jane Doe No. 5] sold drugs to numerous people and many surfers. She attended Nygard's pamper parties and offered prostitutes and drugs like Molly from Hawaii and cocaine to the guests;" and

e.     "[Jane Doe No. 5] has moved her criminal empire to Mexico, San Jose del Cabo where she will be selling drugs and prostitutes to surfers at the Shipwreck Spa and anyone she can make a dime off. Everywhere she goes crime follows." *Id.*

359.   Specifically, as to Jane Doe No. 4, Defendant falsely states in the July 9, 2021, YouTube video that:

a.     "[Jane Doe No. 4] uses social media platforms to get in touch with rich men, then unless her dates pay her demands she blackmails and presents false allegations;"

b.     "[Jane Doe No. 4] also has restraining orders against her;"

c.     "[Jane Doe No. 4] is a predator that goes on Bumble and other social media pretending to like older powerful men;"

d.     "[Jane Doe No. 4] makes prostitute deals with these men for $300 an hour and then sues them afterword if they don't meet up with her monetary demands;" and

e.     "[Jane Doe No. 4] is a serious drug addict and prostitute. She has sex with multiple men per day for money." *Id.*

360.   As to Jane Doe No. 4 and Jane Doe No. 6, Defendant falsely states in the July 9, 2021, YouTube video, "[Jane Doe No. 4 and Jane Doe No. 6] were caught numerous times doing witchcraft and satanism which is devil worshipping." *Id.*

361.   In a YouTube video published on November 9, 2021, available for public viewing, Defendant falsely stated as to all Jane Does that "[t]hese unacceptable women accept their bribe and end up going to court to lie under oath to a federal judge." (YouTube video annexed as Exhibit 3).

362.    Specifically, as to Jane Doe No. 2, Defendant falsely states in the November 9, 2021, YouTube video that:

a.      "So like in [Jane Doe No. 2's'] case she wasn't lying she was telling the truth and then they switched that for her to start lying and she didn't want to do that…[s]he got $10,000 to start I think then she was being paid we think about $5000 a month;"

b.      "Well eventually because [Jane Doe 2] was lying to the FBI saying she didn't get paid, and she was then susceptible to being prosecuted by the FBI and she was being threatened by everybody. We don't know if that was Peter or Bacon's people so they wanted to put her in a safe house to get her away so she could keep testifying but not be vulnerable to being either prosecuted or threatened;" and

c.      "[Jane Doe 2] was taken to Colorado. She was put up in a hotel and so she stayed there for a while and then they stopped paying the hotel bill so she was really fucked because she didn't have that much money so she had to resort to prostitution on the streets of Denver to survive." *Id.*

363.    Additionally, Defendant intentionally and knowingly created and printed paper flyers portraying Jane Doe No. 5's photograph and name along with false and harmful statements about her, accusing her of criminal activity, and he has distributed these around the community in which Jane Doe No. 5 currently resides (Copy of flyer annexed as Exhibit 4).

364.    Specifically, the flyer has Jane Doe No. 5's name with the word "Danger" written across the top and falsely called Jane Doe 5 a "criminal" that has "blackmailed and extorted her victims for lots of money." *Id.* The flyer also falsely states that Jane Doe 5 "has been caught numerous times sex trafficking people and selling illegal harmful drugs." *Id.*  This message is repeated a second time in Spanish.

365.    The same flyer identifies and names [Jane Doe No. 4] and [Jane Doe No. 6] as "aliases" of [Jane Doe No. 5], further attributing the same allegations of

1  trafficking in people, trafficking in illegal drugs, and being a "criminal in town with
2  over 75 SEC claims" to these Jane Doe Nos. 4 and 6. *Id.*

3       366.   Such an allegation in this part of Mexico is extremely dangerous for
4  Jane Doe No. 5, because the cartels who sell people and drugs in that region will kill
5  anyone they believed was competition to their criminal empire.

6       367.   Defendant's publication of such false statements has caused Jane Doe
7  No. 5 to suffer special damages with respect to her business, profession, and
8  occupation. Specifically, Jane Doe No. 5 worked in real estate as an Airbnb
9  Superhost in the small city in which she resides and maintained a store where she
10 sold items which included, but were not limited to, clothing, memorabilia including
11 Mickey Mouse and Pikachu collectibles, along with other souvenirs.  Jane Doe No.
12 5 opened her business in September 2020 however she was forced to close her
13 business in August 2021 given the Defendant's false statements which damaged her
14 professional reputation.

15      368.   As an Airbnb Superhost, Jane Doe No. 5 had several rental contracts,
16 which included, but were not limited to, one lease for a 3-bedroom, 4-bathroom
17 house. As a Superhost, in addition to the rental properties, Jane Doe No. 5 also
18 offered experiences which included personally providing yoga and surfing lessons.
19 As a result of the false claims made by Defendant, her efforts to build that business
20 have been sabotaged and obstructed because of the widely spread, false statements
21 distributed via flyer within the community in which she works.

22      369.    Jane Doe No. 5's Superhost business, as well as the store she
23 maintained, relied on referrals including referrals from other businesses, personal
24 acquaintances in the small community in which she resides, and referrals within the
25 surfing community. After the defamation by Defendant, her business suffered a
26 decline in referrals as Defendant's false statements about her harmed her
27 professional reputation and credibility. As a result, Jane Doe No. 5 suffered from a
28 decline in profits due to decreased referrals to her Airbnb properties, decline in

customers frequenting her store, and a decline in clients for yoga and surfing lessons instructed by Jane Doe No. 5.  On one such occasion when Jane Doe No. 5 was providing a surfing lesson to a customer, Defendant paddled out to her location, told the customer that she owed his son money and was dishonest, and then physically ran into Jane Doe No. 5 with his surfboard, causing her injury.  As Jane Doe No. 5 had a steep decline in revenue and profit, due to Defendant's false statements, she suffered pecuniary losses which included, but were not limited to: a $50,000 loss for breaking a lease for one of her rental properties; a $120,000 loss in goods purchased for her store; the value of purchased furniture for one of her rental properties; and the loss of other investments in setting up her business which she was not able to recoup.

370.   Defendant's publication of such false statements has offended all Plaintiffs, exposed them to contempt and/or ridicule, caused reputational harm, caused psychological harm, caused pecuniary loss and, as the statements falsely accuse plaintiffs of sexual misconduct and/or criminal activity, they are defamatory on their face.

## COUNT V

### LIBEL PER SE IN VIOLATION OF
### CALIFORNIA CIVIL CODE § 45-a

371.   Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1-324, as if fully set forth in this Count.

372.   Defendant intentionally published, or caused to be published, false and harmful statements through videos published on a YouTube Channel called the "Not Me Movement."

373.   On July 9, 2021, October 6, 2021, October 7, 2021, and November 9, 2021, videos were published on this channel about Jane Doe Nos. 4, 5, and 6, with knowledge of their falsity, on the internet for public viewing, including accusing them of criminal activity and sexual misconduct, among other things.

374.   In the YouTube video published on July 9, 2021, available for public viewing, Defendant falsely and collectively referred to Jane Doe Nos. 4, 5, and 6 as:

a.   "evil prostitute[s]," "[] serious drug addict[s]," "fraud girls and all the other phony Jane Does," "sex trafficker[s]," and "devil worshipper[s]", committing extortion, partaking in "blackmail," engaging in "satanism" and "witchcraft," and "stealing from innocent families;"

b.   "[w]hat these girls are doing is elderly endangerment, extortion, credit card fraud;" and

c.   "These types women achieved their monetary goals by going on social media and other dating sites showing their bodies so that they can date old powerful men that they will eventually end up suing and blackmailing, threatening if they don't respond with their ridiculous demands." (YouTube video annexed as Exhibit 2).

375.   Specifically, as to Jane Doe No. 6, Defendant falsely states in the July 9, 2021, YouTube video that she is "another evil prostitute that has done many illegal and wrongful actions against innocent people. She sleeps for money with very wealthy old men." *Id.*

376.   Specifically, as to Jane Doe No. 5, Defendant falsely states in the July 9, 2021, YouTube video that:

a.   "This woman should be sitting in jail, not on first class flights to remote destinations with the money that she stole from hard working and innocent families;"

b.   "[Jane Doe No. 5's] biggest weapon is her social media. She uses it to attack and defame innocent people. It is a shame how many lives she has ruined;"

c.   "[Jane Doe No. 5] has working prostitutes all over the world. She is in charge in setting them up with Rich People, at first for money and later using them for creating false accusations of rape or sexual assault with the crooked Gutzler or Haba Law firms. Lots of this type of girls are present in fake declarations reading their false illegal scripts to the FBI;"

d.      "[Jane Doe No. 5] sold drugs to numerous people and many surfers. She attended Nygard's pamper parties and offered prostitutes and drugs like Molly from Hawaii and cocaine to the guests;" and

e.      "[Jane Doe No. 5] has moved her criminal empire to Mexico, San Jose del Cabo where she will be selling drugs and prostitutes to surfers at the Shipwreck Spa and anyone she can make a dime off. Everywhere she goes crime follows." *Id.*

377.    Specifically, as to Jane Doe No. 4, Defendant falsely states in the July 9, 2021, YouTube video that:

a.      "[Jane Doe No. 4] uses social media platforms to get in touch with rich men, then unless her dates pay her demands she blackmails and presents false allegations;"

b.      "[Jane Doe No. 4] also has restraining orders against her;"

c.      "[Jane Doe No. 4] is a predator that goes on Bumble and other social media pretending to like older powerful men;"

d.      "[Jane Doe No. 4] makes prostitute deals with these men for $300 an hour and then sues them afterword if they don't meet up with her monetary demands;" and

e.      "[Jane Doe No. 4] is a serious drug addict and prostitute. She has sex with multiple men per day for money." *Id.*

378.    As to Jane Doe No. 4 and Jane Doe No. 6, Defendant falsely states in the July 9, 2021, YouTube video that, "[Jane Doe No. 4 and Jane Doe No. 6] were caught numerous times doing witchcraft and satanism which is devil worshipping." *Id.*

379.    In a YouTube video published on November 9, 2021, available for public viewing, Defendant falsely states as to all Jane Does that "[t]hese unacceptable women accept their bribe and end up going to court to lie under oath to a federal judge." (YouTube video annexed as Exhibit 3).

380. Specifically, as to Jane Doe No. 2, Defendant falsely states in the November 9, 2021, YouTube video that:

a. "So like in [Jane Doe No. 2's'] case she wasn't lying she was telling the truth and then they switched that for her to start lying and she didn't want to do that…[s]he got $10,000 to start I think then she was being paid we think about $5000 a month;"

b. "Well eventually because [Jane Doe 2] was lying to the FBI saying she didn't get paid, and she was then susceptible to being prosecuted by the FBI and she was being threatened by everybody. We don't know if that was Peter or Bacon's people so they wanted to put her in a safe house to get her away so she could keep testifying but not be vulnerable to being either prosecuted or threatened;" and

c. "[Jane Doe 2] was taken to Colorado. She was put up in a hotel and so she stayed there for a while and then they stopped paying the hotel bill so she was really fucked because she didn't have that much money so she had to resort to prostitution on the streets of Denver to survive." *Id.*

381. Additionally, Defendant intentionally and knowingly created and printed paper flyers portraying Jane Doe No. 5's photograph and name along with false and harmful statements about her, accusing her of criminal activity, and he has distributed these around the community in which Jane Doe No. 5 currently resides (Copy of flyer annexed as Exhibit 4).

382. Specifically, the flyer has Jane Doe No. 5's name with the word "Danger" written across the top and falsely called Jane Doe 5 a "criminal" that has "blackmailed and extorted her victims for lots of money." *Id.* The flyer also falsely states that Jane Doe 5 "has been caught numerous times sex trafficking people and selling illegal harmful drugs." *Id.* This message is repeated a second time in Spanish.

383. The same flyer identifies and names [Jane Doe No. 4] and [Jane Doe No. 6] as "aliases" of [Jane Doe No. 5], further attributing the same allegations of

1  trafficking in people, trafficking in illegal drugs, and being a "criminal in town with

2  over 75 SEC claims" to these Jane Doe Nos. 4 and 6. *Id.*

3      384.   Such an allegation in this part of Mexico is extremely dangerous for

4  Jane Doe No. 5, because the cartels who sell people and drugs in that region will kill

5  anyone they believed was competition to their criminal empire.

6      385.   Defendant's publication of such false statements has caused Jane Doe

7  No. 5 to suffer special damages with respect to her business, profession, and

8  occupation. Specifically, Jane Doe No. 5 worked in real estate as an Airbnb

9  Superhost in the small city in which she resides and maintained a store where she

10  sold items which included, but were not limited to, clothing, memorabilia including

11  Mickey Mouse and Pikachu collectibles, along with other souvenirs.  Jane Doe No.

12  5 opened her business in September 2020 however she was forced to close her

13  business in August 2021 given the Defendant's false statements which damaged her

14  professional reputation.

15      386.   As an Airbnb Superhost, Jane Doe No. 5 had several rental contracts,

16  which included, but were not limited to, one lease for a 3-bedroom, 4-bathroom

17  house. As a Superhost, in addition to the rental properties, Jane Doe No. 5 also

18  offered experiences which included personally providing yoga and surfing lessons.

19  As a result of the false claims made by Defendant, her efforts to build that business

20  have been sabotaged and obstructed because of the widely spread, false statements

21  distributed via flyer within the community in which she works.

22      387.   Jane Doe No. 5's Superhost business, as well as the store she

23  maintained, relied on referrals including referrals from other businesses, businesses

24  and personal acquaintances in the small community in which she resides, and

25  referrals within the surfing community. After the defamation by Defendant, her

26  business suffered a decline in referrals as Defendant's false statements about her

27  harmed her professional reputation and credibility. As a result, Jane Doe No. 5

28  suffered from a decline in profits due to decreased referrals to her Airbnb properties,

decline in customers frequenting her store, and a decline in clients for yoga and surfing lessons instructed by Jane Doe No. 5.  On one such occasion when Jane Doe No. 5 was providing a surfing lesson to a customer, Defendant paddled out to her location, told the customer that she owed his son money and was dishonest, and then physically ran into Jane Doe No. 5 with his surfboard, causing her injury.  As Jane Doe No. 5 had a steep decline in revenue and profit, due to Defendant's false statements, she suffered pecuniary losses which included, but were not limited to: a $50,000 loss for breaking a lease for one of her rental properties; a $120,000 loss in goods purchased for her store; the value of purchased furniture for one of her rental properties; and the loss of other investments in setting up her business which she was not able to recoup.

388.   Defendant's publication of such false statements has offended all Plaintiffs, exposed them to contempt and/or ridicule, caused reputational harm, caused psychological harm, caused pecuniary loss and, as the statements falsely accuse plaintiffs of sexual misconduct and/or criminal activity, they are defamatory on their face.

## **REQUEST FOR RELIEF**

Plaintiffs respectfully request that the Court enter judgment in their favor, and against Defendant, as follows:

a.   That the Court grant permanent injunctive relief to prohibit Defendant from continuing to engage in the unlawful acts and practices described herein;

b.   That the Court award Plaintiffs compensatory, consequential, general, and normal damages in an amount to be determined at trial;

c.   That the Court award punitive or exemplary damages in an amount to be determined at trial;

d.   That the Court award to Plaintiffs the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

1      e.    That the Court award pre- and post-judgment interest at the maximum

2  legal rate; and

3      f.    That the Court grant all such other relief as it deems just and proper.

4  **JURY DEMAND**

5      Plaintiffs demand a trial by jury on all claims so triable.

6

7  Dated: June 2, 2022        By:    */s/ Deborah S. Dixon*

8                                             John H. Gomez

                                         Deborah S. Dixon

9                                           **GOMEZ TRIAL ATTORNEYS**

10

11                                           Greg G. Gutzler (*pro hac vice*)

                                         F. Franklin Amanat (*pro hac vice*)

12                                           **DiCELLO LEVITT GUTZLER LLC**

13                                           Lisa D. Haba (*pro hac vice*)

14                                           **THE HABA LAW FIRM, P.A.**

15                                           ***Counsel for Plaintiffs***

16

17

18

19

20

21

22

23

24

25

26

27

28

*Jane Doe Nos. 1-10 v. Daniel S. Fitzgerald*, Case No. 2:20-cv-10713-MWF-RAO
FOURTH AMENDED COMPLAINT